946 F.2d 608
 UNITED STATES of America, Plaintiff-Appellee,
v.
George Gordon AIKINS, Roosevelt Rodney, Manuel Arcenio
Angulo-Castillo, Roberto Daniel Cayasso-Schellett, Lai Chai
Hai, Anastacio Henry-Barnard, Eusebio Samudio-Jiminez,
William Graham Snyder, Defendants-Appellants.
 Nos. 88-1369, 88-1373 to 88-1379, and 89-16067.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1990.
Decided Aug. 15, 1990.
As Amended on Grant of Rehearing; Government's Petition for
Rehearing Denied Oct. 2, 1991.
 
 Appeal from the United States District Court for the District of Hawaii.
 John Ashford Thompson, Michael R. Levine, Federal Public Defender, Benjamin B. Cassidy, III, Richard T. Pafundi, William A. Harrison, R. Steven Geshell, Richard S. Kawana, Honolulu, Hawaii, for defendants-appellants.
 Louis A. Bracco, Asst. U.S. Atty., Honolulu, Hawaii, for plaintiff-appellee.
 Before CANBY, NOONAN and RYMER, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 George Aikins, Manuel Angulo-Castillo, Roberto Cayasso-Schellett, Lai Chai Hai, Anastacio Henry-Barnard, Roosevelt Rodney, Eusebio Samudio-Jiminez, and William Snyder were convicted of possessing with intent to distribute 21,000 pounds of marijuana on the high seas on February 19, 1988 and of distributing a separate 14,000 pounds of marijuana on the high seas on February 17, 1988, all in violation of the Maritime Drug Enforcement Act, 46 U.S.C.App. § 1903(a). We reverse their convictions and remand for a new trial.FACTS
 
 
 2
 The facts are well set out by Judge Takasugi in the district court and with minor editorial revisions are restated here:
 
 
 3
 During an ongoing undercover investigation of marijuana trafficking/importation, approximately two weeks preceding the seizure in this case, an undercover United States Customs agent was solicited by a marijuana trafficker to off-load a large quantity of marijuana from a mother ship located on the high seas southeast of the Hawaiian Islands. The undercover agent agreed to provide a vessel to off-load marijuana from the mother ship and transport the substance to the Bay Area of Northern California as directed by the trafficker.
 
 
 4
 A plan was developed among members of United States Customs, Drug Enforcement Administration and the United States Coast Guard whereby a crew of federal agents, posing as marijuana traffickers, would rendezvous with the mother ship and off-load the marijuana. The plan included the United States Coast Guard cutter Mallow 's following the undercover off-load vessel at a safe distance and remaining in radio contact with the off-load vessel.
 
 
 5
 On February 16 and 17, 1988, the undercover vessel rendezvoused with the mother ship approximately 600-800 miles southeast of the Hawaiian Islands. The mother ship was identified as the Christina M, a Panamanian coastal freighter bearing a Panamanian flag. After off-loading to a capacity of approximately 14,000 pounds of marijuana from the Christina M, the undercover agents were able to ascertain that the Panamanian freighter still had a large quantity of marijuana remaining aboard. All identification, registry and description of the Christina M were relayed by radio from the undercover crew to the Mallow.
 
 
 6
 Thereafter, the government contends that on February 18, 1988, U.S. Coast Guard officials on the Mallow sought and received permission from Panamanian officials "to the enforcement of United States law by the United States against the individuals found aboard the M/V Christina M." The Christina M was not then proceeding toward the United States.
 
 
 7
 On February 19, 1988, some 48 hours after the previous off-loading operation by the undercover vessel, the Mallow closed within visual distance of the Christina M. Lt. Commander Christian Bohner, Commanding Officer of the Mallow, identified the Mallow as a United States Coast Guard vessel and requested permission to board the Christina M. Defendant Augustus Rodney, Captain of Christina M, initially refused Bohner's request. Bohner then indicated to Rodney that the Coast Guard had permission of the Panamanian authorities to board and search the Christina M and that he, Bohner, had "other means" to stop the Christina M. Rodney relented and the Christina M made no effort to flee.
 
 
 8
 Shortly thereafter, without a search or arrest warrant or any efforts to secure same, the Coast Guard personnel from Mallow boarded the Christina M for the express purpose of searching the freighter for marijuana. A strong odor of marijuana was immediately apparent to all members of the boarding party. They found in excess of 21,000 pounds of marijuana in the aft hold. Although no other cargo was found, other than the bales of marijuana, documents and other personal effects were found and seized from the living quarters assigned to the crew. Rodney and his crew of seven men were arrested. The Mallow possessed radio equipment capable of communicating with a magistrate in Hawaii or the mainland.
 
 
 9
 Captain Rodney and the seven crew members were arrested and subsequently indicted.
 
 PROCEEDINGS
 
 10
 The defendants moved to suppress the evidence. The district court, per Judge Takasugi, denied the motion. United States v. Aikens, 685 F.Supp. 732 (D.Hawaii 1988).
 
 
 11
 According to a procedure not unusual in some district courts, the voir dire of the jury was conducted by a magistrate. The defendants objected, each using the following written form:OBJECTION TO MAGISTRATE CONDUCTING VOIRE DIRE
 
 
 12
 The defendant objects to having voire dire conducted by a magistrate and requests that it be done by the district court.
 
 
 13
 Although the Ninth Circuit has held that it is not unconstitutional for the magistrate to conduct voire dire, e.g., United States v. Bezold, 760 F.2d 999 (9th Cir.1985), cert. denied, 474 U.S. 1063, 106 S.Ct. 811, 88 L.Ed.2d 786 (1986), the Fifth Circuit has recently held to the contrary. United States v. Ford, 824 F.2d 1430 (5th Cir.1987) (en banc ), cert. denied, 484 U.S. 1034, 108 S.Ct. 741, 98 L.Ed.2d 776 (White, J., dissenting). Because of split in the circuits, certiorari is likely to be granted by the Supreme Court to resolve the issue. The defendant, therefore, wishes to preserve his objection for the record.
 
 
 14
 The magistrate overruled the objection and went ahead with the voir dire. All counsel made numerous objections to the magistrate's failure to ask follow-up questions of certain jurors, to his failure to excuse certain jurors for cause, and to certain remarks of his to the jury that the defendants asserted were prejudicial questions.
 
 
 15
 The case was assigned to visiting judge Robert P. Aguilar for trial. Counsel raised various objections before him regarding the magistrate's conduct of jury selection. In response Judge Aguilar offered to select a new jury panel or, alternatively, to pose additional questions to the impaneled jury and to admonish them to disregard any prejudicial remarks made by the magistrate.
 
 
 16
 Judge Aguilar stated his views as to selecting a new jury including these remarks: "If necessary, I will pick a jury. I don't want to pick a jury. I want to get this case started. I have a calendar for the balance of the month that does not provide for an extra day to pick a jury." In the face of these comments, defendants' counsel acquiesced in the panel that had been selected.
 
 
 17
 The trial proceeded in 1988, the defendants were convicted. They appeal.
 
 ANALYSIS
 
 18
 1. Selection of the Jury.
 
 
 19
 In 1989, the Supreme Court held that a magistrate did not have jurisdiction to select the jury in a felony case. Gomez v. United States, 490 U.S. 858, 109 S.Ct. 2237, 2247-2248, 104 L.Ed.2d 923 (1989). This court has held that Gomez must be applied to all cases not yet final on July 7, 1989, the date on which the mandate in Gomez issued. United States v. France, 886 F.2d 223, 227 (9th Cir.1989). The present case was not final on the relevant date. Therefore Gomez governs.
 
 
 20
 The government argues that certiorari has been granted in France, --- U.S. ----, 110 S.Ct. 1921, 109 L.Ed.2d 285 (1990), and that this case should not be decided pending the disposition of France by the Supreme Court. There appears, however, no doubt that the retroactivity of Gomez is required by Griffith v. Kentucky, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). Accordingly, there is no reason not to apply Gomez retroactively here. We are not otherwise dependent upon the holdings in France.
 
 
 21
 Gomez points out that by statute a magistrate's jurisdiction to try a misdemeanor "depends on the defendant's specific, individual consent." Gomez, 490 U.S. at 871-72, 109 S.Ct. at 2245 (citing 18 U.S.C. § 3401(b)). Here, where the issue is whether the magistrate may preside over the selection of jurors and the case involves a felony and not a misdemeanor, the same safeguard should apply. The waiver of objection must be by specific written consent.
 
 
 22
 A defendant prosecuted for a felony has the "basic ... right to have all critical stages of [his] criminal trial conducted by a person with jurisdiction to preside." Id. 490 U.S. at 876, 109 S.Ct. at 2248. As Gomez recognizes, jury selection is a critical stage. If consent can confer authority to preside--a proposition doubted in France, 886 F.2d at 227--that consent must meet the minimal requirements of being specific and individual.
 
 
 23
 An additional reason leads us to doubt the consent here given. As Gomez points out, Congress has provided by statute that, in a civil case, "neither the district judge nor the magistrate shall attempt to persuade or induce any party to consent to reference of a civil matter to a magistrate." Gomez, 490 U.S. at 869-70, 109 S.Ct. at 2244 (citing 28 U.S.C. § 636(c)(2)). This court has said en banc that the waiver of the right to an Article III judge must be "freely and voluntarily undertaken." Pacemaker Diagnostic Clinic of America v. Instromedix, 725 F.2d 537, 543 (9th Cir.) (en banc) (per Kennedy, J.), cert. denied, 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). In the present case, the defendants' agreement was induced by Judge Aguilar, whose strong indication of what he considered the desirable and practicable course of action left the defendants with no choice.
 
 
 24
 Because their consent was induced and because their consent was neither specific nor individual there was no agreement to the magistrate selecting the jury. The jury was invalidly selected by an officer without jurisdiction to act. The case must be retried.
 
 
 25
 A number of issues have been presented by the defendants as to rulings made by Judge Aguilar in the course of the trial, and they have challenged his failure to recuse himself. We need not decide these issues on this appeal. The defendants, however, have presented certain issues which go to the question of whether there is admissible evidence against them or whether there is jurisdiction to try them. These issues must be dealt with now.
 
 
 26
 2. The Search and Seizure of the Christina M.
 
 
 27
 The defendants raise the protection of the Fourth Amendment in objection to the Coast Guard's search and seizure of the vessel. The Fourth Amendment was not "understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory or in international waters." United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 1061, 108 L.Ed.2d 222 (1990). The Fourth Amendment does not apply to a search of aliens conducted in foreign territory. Id. 494 U.S. at ----, 110 S.Ct. at 1066. The Fourth Amendment does not apply to the search of non-resident aliens on a ship in international waters. United States v. Davis, 905 F.2d 245, 250-51 (9th Cir.1990). All but one of the defendants here was an alien to whom the guarantees of the Fourth Amendment do not apply. William Snyder, who is an American citizen, has no standing to challenge the search of the Christina M, "it being well settled that the crew has no legitimate expectation of privacy in the cargo hold of a vessel." United States v. Peterson, 812 F.2d 486, 494 (9th Cir.1987).
 
 
 28
 3. The Constitutionality of the Maritime Drug Law Enforcement Act.
 
 
 29
 The defendants contend that the Maritime Drug Law Enforcement Act, 46 U.S.C.App. § 1903(a), is unconstitutional as applied to them. It has been established that the Act is intended by Congress to apply to conduct on the high seas. Davis, at 248. It is clear that Congress has power "to define and punish piracies and felonies committed on the high seas." United States Constitution, Art. I, Sec. 8, cl. 10. The statute is not void for vagueness: it expressly prohibits the possession of drugs on certain vessels with intent to distribute. United States v. Mena, 863 F.2d 1522, 1527 (11th Cir.) cert. denied, 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). The statute is not applied to the defendants ex post facto; although Panama gave its consent after they had set to sea, they took the risk of such consent being given. Id. at 1528.
 
 
 30
 Due process is not offended by the extent of the jurisdiction created if there is a sufficient nexus between the conduct condemned and the United States. Davis, at 248-49; Peterson, 812 F.2d at 493-94. A sufficient nexus exists where the ship with drugs is bound ultimately for the United States. Id. In the present case, although the Christina M at the moment of seizure was not headed in the direction of the United States, the entire operation of off-loading was set up by an agreement that was designed to bring the off-loaded marijuana into the United States. A sufficient nexus existed. Davis, 905 F.2d at 249; Peterson, 812 F.2d at 493-94.
 
 
 31
 4. Evidence of the Consent of Panama.
 
 
 32
 The statute provides that the consent of a foreign nation to the enforcement of United States law "may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee." 46 U.S.C.App. § 1903(c)(1).
 
 
 33
 The consent of Panama to the enforcement of the law of the United States aboard the Christina M was proved by a certificate issued by Tom R. Wilson, Jr., the designee of the Secretary of State. On March 3, 1988 Wilson certified: "That on February 18, 1988 the government of Panama consented to the enforcement of the United States law by the United States against the individuals found aboard the M/V Christina M." A further certificate of George P. Shultz, Secretary of State, declared that Wilson was authorized to issue such a certificate.
 
 
 34
 Invoking the Confrontation Clause of the Sixth Amendment and the hearsay rule, the defendants make heavy weather about this evidence. They contend that it violates the hearsay rule and deprives the defendants of the opportunity to confront the witnesses against them. The defendants are mistaken in these contentions.
 
 
 35
 Evidence in the form of a certificate of an officer of the government with authority to issue the certificate is an old and well-established exception to the general prohibition against hearsay. The certificate of a governmental official is a particular case of the admissibility of a public document. The general reason for the exception is the probable trustworthiness of the public officer's statement and the great inconvenience that would be caused to public business if public officers had to be called to court to verify in person every fact they certify. See Wigmore on Evidence, §§ 1631-32 (Chadbourn rev.1974). Thousands of statutes permit certification of facts by public officials. Id. § 1676. The certificate of a notary is, for example, a common instance. Id. § 1675. No one supposes that the Confrontation Clause is violated if the notary does not appear. The certificate of an authorized official "is admissible only for those facts covered by the terms of the authority, and, conversely, that it is admissible to prove all the facts thus included." Id. § 1674 (footnote and emphasis omitted).
 
 
 36
 Wilson's certificate sets out what appears to be his means of knowing the fact of consent to which he certifies, viz., that Charles Vopat, a State Department employee at the embassy in Panama contacted Captain Luis Quiel, who represented the Panamanian government with authority to consent to the enforcement of law against vessels of Panamanian registration. The defendants characterize Quiel's consent as hearsay. Again, the defendants are mistaken.
 
 
 37
 Quiel's consent was not hearsay but a verbal act. See Mena, 863 F.2d at 1531. Vopat's report, inferably the source of Wilson's knowledge, is hearsay, but it is hearsay which the exception of Wilson's admissible certificate covers. Wilson had authority to certify. His authority is not diluted, and the admissibility of his certificate is not diminished, because he indicated the basis for his statement. See S.Rep. No. 530, 99th Cong., 2d Sess. 16 (1986), reprinted in 1986 U.S.Code Cong. & Admin.News 5986, 6001 (detailing what information should be included in the certificate).
 
 
 38
 In an early instance of a certificate being upheld, the Postmaster General certified that a particular postmaster owed a certain sum of money to the United States. There was no suggestion that the Postmaster General had personally computed the amount owing; he must have relied on the report of a subordinate. See United States v. Dumas, 149 U.S. 278, 13 S.Ct. 872, 37 L.Ed. 734 (1893). So here the designee of the Secretary of State could properly rely on those in his chain of command. A probability of trustworthiness attends the statement of the certifying officer; it is equally probable that the officer has taken reasonable measures to assure himself of the fact he certifies.
 
 
 39
 Settled practice understands the Confrontation Clause not to require the presence at trial of every officer whose certificate is in evidence. But by authorizing a certificate Congress does not authorize the creation of irrebuttable facts. The certificate of Wilson is not conclusive. It is only prima facie evidence of the fact certified and so may be rebutted by the defendants. Dumas, 149 U.S. at 285-87, 13 S.Ct. at 874. Thus the defendants were entitled to depose Quiel, if they could show that he would submit to deposition expeditiously. See Peterson, 812 F.2d at 494. At the same time it should be noted that Peterson held that a telex "sent to the Coast Guard" was "substantial evidence of Panamanian consent." Id. at 495. In short, consent can be disputed or proved in ways beyond the certificate.
 
 
 40
 REVERSED AND REMANDED FOR TRIAL.