UNITED STATES of America, Plaintiff,

v.

Abdul RASHEED, et al., Defendants.

Cr. No. 91–01329 ACK.

United States District Court,
D. Hawaii.

July 23, 1992.

Daniel Bent, Stu Gasner, Sharon Takeuchi, U.S. Attys. Office, Honolulu, Hawaii, for plaintiff.

Robert Rau, Honolulu, Hawaii, J. Tony Serra, James Bustamante, Serra, Perelson, Lichter, Daar & Bustamante, San Francisco, Cal., for Abdul Rasheed.

Jeffrey T. Arakaki, Honolulu, Hawaii, for Muhammad Ahmed Tarif Khan.

Karen S.S. Ahn, Honolulu, Hawaii, for Mohammad Waheedullah Khan.

Lunsford Dole Phillips, Honolulu, Hawaii, for Muhammad Rafiq.

Lane Takahashi, Honolulu, Hawaii, for Muhammad Yousuf.

Wayne Tashima, Honolulu, Hawaii, for Mohammad Afzal.

Samuel P. King, Jr., Honolulu, Hawaii, for Haji Saleem.

Ignacio Garcia, Honolulu, Hawaii, for Fnu Ismail.

Richard S. Kawana, Honolulu, Hawaii, for Muhammad Hanif.

William Harrison, Honolulu, Hawaii, for Farid Ahmed.

Richard Pafundi, Honolulu, Hawaii, for Ghazanfar Ali.

Thomas D. Collins, III, Honolulu, Hawaii, for Mohammad Ali.

Robert Finlay, Honolulu, Hawaii, for Abdul Karim.

Richard Ney, Federal Public Defender, for Muhammad Saleem.

## ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND TO SUPPRESS EVIDENCE AND QUASH ARREST

KAY, Chief Judge.

Multiple Defendants bring several motions in which other Defendants join. Since all Defendants will stand or fall together, this Order consolidates all motions and does not indicate in whose pleadings the issues are raised. This Order considers each of the two major motions in turn: A. the motions to dismiss, and B. the motion to quash arrest and suppress evidence.

### I. FACTS

On October 24, 1991, the United States of America ("United States" or the "government") filed a three count superseding indictment charging fourteen Defendants with violations of the Maritime Drug Law Enforcement Act, 46 U.S.C.App. § 1903 ("§ 1903") and 18 U.S.C. § 2.[1] The charges arise from actions taken by a St. Vincent registered vessel, the Lucky Star, upon which all Defendants in this case were aboard.

In May 1991, Dennis Feroce ("Feroce") and Jack Hayden ("Hayden"), neither of whom are defendants in this case, sought a captain and crew to rendezvous with a mother ship carrying hashish on the high seas.[2] On May 8, 1991, Feroce and Hayden met in Hawaii with two undercover U.S. Customs Service agents, Mike Gillion ("Gillion") and Brian Rockam ("Rockam"). Feroce also had other meetings with Customs agents including meetings with Rockam in Port Townsend, Washington and San Francisco, California. At these two meetings, Feroce discussed and planned to have the undercover agents rendezvous with the Lucky Star and off-load the hashish. A third undercover agent, Paul DeCotiis ("DeCotiis"), had numerous meetings and telephone conversations, most of which occurred in the United States, with Feroce and his alleged co-conspirator Charlie Sotirkys ("Sotirkys"). Many of these conversations also focused on the logistics of the off-load operation. Rockam and Gillion received over $200,000 and 225,000 Swiss francs as advanced payment for the off-load operation.

The plan regarding where to deliver the hashish after it was off-loaded from the Lucky Star was flexible. The original plan was for the undercover agents to deliver the hashish to the Queen Charlotte Islands on the Canada–United States border. The backup plan was to deliver the hashish to ports near Eureka, California or to a port in Alaska, referred to by Feroce, Sotirkys, and Hayden as "B-ports." During the discussions on the plan, Feroce and Hayden said the ultimate destination of the hashish was the "East Coast" or "New York."

On June 23, 1991, Gillion, Rockam, and other undercover agents from the Customs Service and the FBI (collectively "Agents") met the Lucky Star some 1200 miles west of the US. The Agents were aboard the "Pandora." For the purposes of this operation, however, the name of the ship had been changed to the "Barbara H." The Barbara H. flew an American flag and displayed San Diego, California as its home port. Although the seas were rough, the Lucky Star transferred approximately 2.5 tons of hashish to the Pandora. All of the Defendants in this case were aboard the Lucky Star. Everyone on the Lucky Star is a citizen of Pakistan, except David McNelly (15) ("McNelly") who is a resident of Hawaii.[3] During and after the off-load,

---

**1.** 18 U.S.C. § 2 provides,

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principle.

(b) Whoever willfully causes an act to be done for which if directly performed by him or another would be an offense against the United States, is punishable as a principle.

**2.** Both Feroce and Hayden are defendants in a related prosecution in the Northern District of California. That prosecution is for conspiring to smuggle hashish from the Lucky Star into the United States.

**3.** McNelly, along with another Defendant, pled guilty before the hearing on the instant motions. Several days after the hearing, all of the Defendants except Defendant Rasheed pled guilty, re-

the alleged mainland conspirators, several of whom were American citizens, monitored the progress of the operation from United States soil by radio and telephone. Indeed, the evidence adduced at the hearing established that Sotirkys and Feroce controlled the Lucky Star from the mainland United States by relaying messages to the crew through undercover agent DeCotiis.

On July 1, 1991, the U.S. Coast Guard, assisted by the U.S. Navy,[4] made radio contact with the Lucky Star. The master of the Lucky Star, Defendant Rasheed (01), consented to the boarding. The Coast Guard, accompanied by Navy personnel, boarded and searched the Lucky Star. The search revealed over 70 tons of hashish in the unlocked cargo hold.

Pursuant to § 1903, the Coast Guard, in coordination with the Justice Department, sought the consent of the Lucky Star's flag nation, St. Vincent, to apply United States law to the vessel. While awaiting consent from St. Vincent, the boarding party remained on board the Lucky Star, however, the crew members were not placed under arrest. During this time, the Coast Guard asked for and received Rasheed's permission to head towards Honolulu. Indeed, at all times, the Coast Guard obeyed Rasheed's directions as to the course the ship would take.[5] On July 11, 1991, as the Lucky Star and its escorts were approaching Honolulu, the St. Vincent government consented to the application of United States law to the Lucky Star. The Coast Guard then formally arrested the Defendants and seized the vessel.

After the seizure of the Lucky Star, its crew, and its contraband, the conspiracy to import Lucky Star's hashish continued. Feroce and Hayden met several times with Gillion and Rockam to plan the delivery of the 2.5 tons of hashish off-loaded from the Lucky Star on June 23, 1991. On September 18, 1991, Hayden and Stanley received the 2.5 tons of hashish in Clearlake, California.

## II. DISCUSSION

### A. MOTIONS TO DISMISS

Defendants move to dismiss the indictment on several grounds, raising a number of issues. These issues are as follows: 1. Whether § 1903 as applied to Defendants violates the Due Process Clause of the U.S. Constitution; 2. Whether St. Vincent's consent to the enforcement of United States law to the Lucky Star was valid; 3. Whether St. Vincent's consent was obtained in violation of international law; and, 4. Whether the Navy's involvement in the operation violated the Posse Comitatus Act. For the reasons discussed below, the Court denies the motions to dismiss.

*Section 1903: The Maritime Drug Law Enforcement Act* Section 1903 provides,

It is unlawful for any person on board ... a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

46 U.S.C.App. § 1903(a). A vessel "subject to the jurisdiction of the United States" includes, *inter alia,*

a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of the United States law by the United States.

46 U.S.C.App. § 1903(c)(1)(C).

*1. Constitutional Restrictions on Applying § 1903 to Defendants: Due Process.*

a. Due Process and Nexus: Application of § 1903 to Defendants is not Arbitrary or Fundamentally Unfair.

■ Defendants contend that § 1903, as applied to them in this case, is unconstitu-

---

serving the right to appeal from this order on the issue of jurisdiction.

**4.** The Coast Guard personnel were aboard two Navy vessels, the Leftwich and the Ingersoll. A helicopter was also used to monitor the Lucky Star.

**5.** As the Lucky Star steamed closer to Honolulu, Defendant Rasheed asked if he could dump his illegal cargo. This was the only request that the Coast Guard personnel did not grant Defendant Rasheed.

tional under the standard discussed in *United States v. Davis*, 905 F.2d 245 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991); *accord, United States v. Aikins*, 946 F.2d 608 (9th Cir.1990); *United States v. Peterson*, 812 F.2d 486 (9th Cir.1987). In *Davis*, the Ninth Circuit articulated a two part test for determining if application of § 1903 violates due process. In order to be constitutionally applied, a statute punishing conduct outside United States territory must meet both prongs of the *Davis* test. First, Congress must make clear its intent to give the statute extraterritorial effect. *Davis*, 905 F.2d at 248. Second, the statute must not violate due process. To comport with due process, there must a "sufficient nexus" between the defendant and the United States such that the application of the statute would not be arbitrary or fundamentally unfair. *Id.* at 248–9.

▪ Congress intended to give § 1903 extraterritorial effect. 46 U.S.C.App. § 1903(h) ("This section is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States." *Id.*); *Davis* at 248. Accordingly, the only issue under the *Davis* test in this case is whether there was a sufficient nexus between the crew of the Lucky Star and the United States so that their prosecution in the United States would not be arbitrary or fundamentally unfair.

▪ The *Davis* Court noted that "[w]here an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for … jurisdiction." *Id.* at 249 (quoting *United States v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987). As the Court's language indicates, a finding that a defendant engaged in an activity which was aimed at causing criminal acts in the United States is sufficient, but not necessary, for an adequate nexus. *See also*, Note, *Survey of the United States Jurisdiction over High Seas Narcotics Trafficking*, 19 Ga.J. Int'l & Comp.L. 119, 124–5 (1989) (Section 1903 "proscribes possession with intent to distribute, but does not require an intent to distribute *in the United States*." *Id.* at 124 (emphasis in original)). It follows that if an activity does, in fact, cause criminal acts in the United States, a sufficient nexus exists.

In *United States v. Aikins*, 946 F.2d 608 (9th Cir.1990), an undercover Customs Service agent was solicited by a marijuana trafficker to off-load a large amount of marijuana from a mother ship located on the high seas southwest of Hawaii. The agent agreed to off-load the marijuana and transport it to the Bay Area of Northern California. After the off-loading operation was complete, the Coast Guard seized the ship.

On these facts, the *Aikins* Court found a sufficient nexus between the defendant and the United States. In so finding, the Court relied exclusively upon the defendants' plan to off-load the drugs to a ship destined for the United States. *Aikins*, 946 F.2d at 613–14 ("the entire operation of off-loading was set up by an agreement that was designed to bring the off-loaded marijuana into the United States. A sufficient nexus existed." *Id.* at 614).

Under the case law discussed above, many of the following circumstances are independently sufficient to establish a nexus between the Lucky Star defendants and the United States. When these circumstances are considered together, in their totality, the evidence of nexus is overwhelming.

*(i) The Lucky Star was Controlled from the United States.*

The uncontroverted evidence adduced at the hearing shows that people from the United States, some of whom are U.S. citizens, controlled the movement and actions of the Lucky Star. The mainland co-conspirators—primarily Dennis Feroce and Charlie Sotirkys—relayed messages to and from the Lucky Star via Special Agents Paul DeCotiis, Brian Rockam, and Mike Gillion. The communications between the co-conspirators in the United States and the Lucky Star on the high seas centered around the anticipated off-load of hashish from the Lucky Star to the Barbara H.

The mainland co-conspirators directed the Lucky Star to meet the Barbara H. at a specific location between the mainland U.S. and Hawaii.

Prior to meeting Feroce, the undercover agents had no contact with the Lucky Star, yet the agents eventually rendezvoused with the hashish-laden vessel. The compelling evidence reveals that the Lucky Star was in contact with, and controlled by, Feroce and his co-defendants. Indeed, Agent Gillion testified at the hearing that the co-conspirators were "in control of the operation." The Court finds that the co-conspirators (primarily Feroce and Sotirkys) gave the Agents orders about how to conduct the off-load and where to take contraband afterwards, as well as providing the Agents the secret code with which to communicate. Furthermore, DeCotiis and Rockam relayed Sotirkys' messages and instructions to the Lucky Star regarding recovery of the balance of the hashish. The fact that the "base station" or nerve center controlling the Lucky Star was in the United States offers a compelling nexus between the captain and crew of the Lucky Star and the United States.

### (ii) May 8, 1991 Meeting in Hawaii.

On May 8, 1991, Special Agents Rockam and Gillion met with Dennis Feroce and Jack Hayden in Honolulu. Feroce and Hayden recruited Rockam and Gillion to meet the Lucky Star and off-load its illegal cargo. At this meeting, the parties discussed the logistics of the proposed off-load operation. It is clear from the testimony of the Special Agents that Feroce and Hayden were in contact with, and in control of, the Lucky Star and its course. It follows that the captain, and thus the crew, of the Lucky Star had an agreement with Feroce, Hayden and probably their co-conspirators. This meeting constitutes an overt act on U.S. soil in furtherance of a conspiracy to possess and import hashish.

### (iii) Destination United States.

Although the primary plan was to bring the hashish into Queen Charlotte Islands, Canada, there were two planned "backup" sites. These "B-ports" were Alaska and Eureka, California.

The Special Agents (primarily Rockam, whose memory was better than Feroce's) testified that Feroce told him of the plan to take the hashish into the United States. This plan was to bring the hashish into the Queen Charlotte Islands in Canada. From there, a tug and barge would transport the hashish up the Fraser River where, at some point, the hashish would be loaded onto tractor trailers and trucked to central Canada. From central Canada, the hashish would be driven into the United States over the farmlands which border the United States and Canada. Agent Rockam testified that he has worked the U.S.—Canadian border and is familiar with the central border area. The proposed plan was plausible in light of the fact that the central border area is one of the largest non-patrolled borders in the world.

In addition, Feroce told Rockam and Gillion that the ultimate destination for the hashish was "New York" or the "East Coast," a fact which Feroce confirmed by testifying that he believed Montreal, Toronto, and New York were the ultimate destinations.

### (iv) Meetings and Phone Calls in the United States.

All three Special Agents testified that they had numerous meetings and phone calls with the mainland co-conspirators to plan the off-load/importation operation. For example, Agent DeCotiis testified that he had approximately 55 conversations with the co-conspirators all of which focused on the coordination and control of the Lucky Star smuggling venture and most of which occurred in the U.S.[6] At several of the meetings, the co-conspirators paid the agents large sums of money to finance the operation and provided the com-

---

**6.** DeCotiis testified that both he and the co-conspirators were in the United States when they spoke on the telephone.

munications code. These meetings took place in Washington (e.g. Sea–Tac Airport), Oregon (e.g. Port Townsend), and California (e.g. San Francisco International Airport). These meetings, in addition to the many phone calls, are additional overt acts in furtherance of the conspiracy to possess and import hashish.

### (v) The 2.5 Tons of Off–Loaded Hashish was Imported into the United States.

Agents Rockam and Gillion eventually delivered the 2.5 tons of off-loaded hashish to Clearlake, California. The delivery was made pursuant to the same general plan by the co-conspirators; the co-conspirators continued to salvage what could be salvaged from the Lucky Star's cargo. The Court finds that the hashish was still owned by the same mainland co-conspirators (who were members of the Medjuk organization). Indeed, the mainland co-conspirators efforts to salvage the 2.5 tons of hashish were part of the same original conspiracy to import the 70 tons of hashish.

The Court finds that the actions of the Lucky Star Defendants caused this criminal act inside the United States. The Lucky Star crew's purpose in this venture was simply to deliver hashish to an off-load vessel; none of the conspirators ever planned for the Lucky Star to deliver its cargo to shore. The Defendants' only role was to provide the hashish to the undercover agents acting on the behalf of the mainland co-conspirators. The mainland co-conspirators could do whatever they wanted with the hashish. Put another way, the Lucky Star Defendants were willfully indifferent to the destination of the hashish. Such willful indifference will not serve to reduce the significance of the fact that the hashish was planned to be distributed in the United States and was, in fact, delivered to the United States with the ship's course and off-loading controlled by radio and telephonic instructions originating in the United States.

Moreover, there were continued efforts, including negotiations and instructions from the co-conspirators within the United States to the Lucky Star on the high seas, to off-load the balance of the hashish.

### (vi) Use of United States Citizens and Vessel.

The mainland co-conspirators actively recruited U.S. citizens and the U.S. vessel, the Barbara H., to accomplish the off-load from the Lucky Star. The Special Agents are obviously Americans, and their boat had "San Diego" painted on it as its home port. Defendant McNelly, a United States citizen on board the Lucky Star, controlled the ship's radio. Under *Davis, supra,* the ultimate nexus question is whether it would be fundamentally unfair to apply U.S. law to the Defendants. Where the Defendants' co-conspirators actively sought, and in fact, used Americans as a means to accomplish their criminal goal, they should not be able to claim that application of U.S. law would be unfair. In other words, by engaging U.S. personnel and equipment, Defendants assumed the risk that U.S. authorities would enforce U.S. law against them.

Overall, the facts in this case provide a stronger nexus between the Defendants and the United States than the defendants in the *Aikins* case had. Therefore, it can hardly be said that application of U.S. law to Defendants is arbitrary or fundamentally unfair. The Court finds that prosecution of the Defendants under United States law does not violate due process.

### b. Due Process and Notice: § 1903 is not Void for Vagueness.

█ Defendants assert that § 1903 is unconstitutional on its face because it provides no fair notice. They contend that under § 1903, a crew may legally commence a voyage but later find that their activity has become illegal under U.S. law. Thus, they argue, § 1903 is vague because a man of common intelligence would have to guess at its meaning and application.

The Ninth Circuit ruled on this exact argument in *Aikins, supra.* The *Aikins* Court held that "[t]he statute [§ 1903] is not void for vagueness: it expressly prohibits the possession of drugs on certain ves-

sels with intent to distribute." *Aikins*, 946 F.2d at 613 (citing *United States v. Mena*, 863 F.2d 1522, 1527 (11th Cir.) *cert. denied*, 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)). Because the Ninth Circuit has already ruled that § 1903 is not facially unconstitutional, the Court rejects Defendants' argument that § 1903 is void for vagueness.

### 2. The Validity of St. Vincent's Consent.

Section 1903(c)(1)(C) provides that a foreign vessel is subject to the jurisdiction of the United States when the flag nation "has consented to or waived objection to the enforcement of United States law by the United States."

Defendants claim that St. Vincent's consent to the United States' enforcement of U.S. law is invalid because the consent came eleven days after the Coast Guard boarded and searched the Lucky Star. Defendants make two arguments. They argue that § 1903 violates the constitutional prohibition against *ex post facto* laws. Defendants also claim that because the United States did not receive the consent of St. Vincent until July 11, 1991, the government failed to meet the requirements of § 1903. They contend that the language of § 1903 is clear: the flag nation must consent before enforcement of U.S. law. Defendants point to the statute's use of the past tense—"*has consented* to" and "*waived* objection." This Court's jurisdiction over the Defendants arises from § 1903. Since the requirements of § 1903 were not met, Defendants argue, this Court lacks jurisdiction over them.

Before considering either argument, the Court must determine whether Defendants have standing to challenge the consent requirement of § 1903. After discussing standing, the Court will discuss the extent to which Defendants may challenge St. Vincent's consent.

a. Standing.

■ The government asserts that the Defendants lack standing to question the validity of St. Vincent's consent under § 1903. Section 1903(d) provides,

A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter.

46 U.S.C.App. § 1903(d). The exact nature of the government's argument is not clear. One interpretation is that the Defendants lack standing to challenge in any way the United States' jurisdiction over the Lucky Star.[7] In support of its contention that Defendants lack standing, the government quotes the following language from the congressional record: "[O]nly the flag nation of a vessel should have a right to question whether the Coast Guard has boarded that vessel with the required consent." S.Rep. No. 530, 99th Cong., 2d Sess. 15–16 (1986), *reprinted in* 1986 U.S.Code Cong. and Admin.News 5986, 6001. The government argues that this language demonstrates Congress' intent to completely divest a defendant of the opportunity to challenge United States jurisdiction over a vessel.

The government raised this same argument in *United States v. Mena*, 863 F.2d 1522 (11th Cir.), *cert. denied* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989), a case cited favorably by the Ninth Circuit in *Aikins, supra*. The *Mena* Court declined to adopt the government's position stating that although the quoted language indicates an intent to prevent defendants from objecting to jurisdiction over a vessel, the language of § 1903(d) is clear. The Court reasoned that if Congress had intended to divest a defendant of standing to object to the United States' non-compliance with the requirements of § 1903, Congress would have so indicated. *Mena*, 863 F.2d at 1531.

---

**7.** The other interpretation of the government's argument is that Defendants lack standing to question the *timing* of St. Vincent's consent. As is discussed below, the timing argument has merit.

Thus, the *Mena* Court concluded that a defendant has standing to challenge the United States' compliance with the terms of § 1903.

The Court agrees with the reasoning of *Mena*. By objecting to the United States' compliance with the provisions of § 1903, the Defendants are objecting to the application of *United States* law, not *international* law. In essence, Defendants are claiming that on its own terms, the domestic law does not apply in this case. Defendants have standing to challenge the government's assertion that the Lucky Star was a vessel "subject to the jurisdiction of the United States." As is discussed in the next subsection, however, a defendant may only challenge the United States' compliance with the requirements of § 1903 insofar as the United States does not obtain the requisite consent from the flag nation. In other words, once the flag nation consents, the requirements of § 1903 are fulfilled and a defendant may no longer object to its application.

b. Jurisdiction over the Lucky Star.

■ As indicated above, the Defendants assert that the requirements of § 1903 were not satisfied in this case because St. Vincent's consent came some ten days after the Coast Guard boarded the Lucky Star. They argue that because the requirements were not satisfied, the Lucky Star is not a vessel subject to the jurisdiction of the United States, and the case should be dismissed. While Defendants' argument may have some initial appeal, the case law indicates that Defendants may not challenge the timing of the consent.

The issue is one of first impression in the Ninth Circuit; however, the Eleventh Circuit has considered a similar issue in *United States v. Mena*, 863 F.2d 1522 (11th Cir.), *cert. denied* 493 U.S. 834, 110 S.Ct.

110, 107 L.Ed.2d 72 (1989) (cited with approval by the Ninth Circuit in *Aikins, supra*). In *Mena*, the Coast Guard, with permission from the master, boarded a Honduran flagged vessel. The boarding party then searched the vessel, finding 35,-000 lbs. of marijuana. Sometime thereafter, the Coast Guard sought and received permission to enforce U.S. law from the Honduran government. As the opinion makes clear, Honduras did not consent to the enforcement of U.S. law until *after* the Coast Guard had boarded and searched the ship.

In affirming the District Court, the Eleventh Circuit held that the defendants' objection to Honduras' late consent was misplaced. The Court noted that "Defendants accepted the risk that Honduras would consent." *Mena*, 863 F.2d at 1528. Although the *Mena* Court considered the defendants' objection under the rubric of *ex post facto* analysis, its reasoning applies with equal force to the jurisdictional issue. Federal courts are required to raise problems with subject matter jurisdiction *sua sponte*. *E.G.*, *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). The jurisdictional issue under § 1903 is clear; it appears on the face of the statute.[8] Certainly, if the late consent by Honduras presented a jurisdictional problem, the Court would have dismissed the case. Thus, *Mena* can be read to stand for the proposition that a vessel is "subject to the jurisdiction of the United States" if the flag nation consents, even if that consent comes after the vessel has been boarded and searched.[9]

■ Other Eleventh Circuit cases support the *Mena* interpretation of § 1903. These cases indicate that the consent requirement of § 1903 is a courtesy extended to foreign governments, not to drug smugglers. Accordingly, only the flag nation,

---

8. In order for § 1903 to apply to someone, the ship in question must be "a vessel *subject to the jurisdiction of* the United States." 46 U.S.C.App. § 1903 (emphasis supplied).

9. Significantly, the Ninth Circuit cited *Mena* with approval several times in the *Aikins* opinion. *See, Aikins* at 613, 614 (citing *Mena* in

support of three different holdings). In *Aikins,* the Ninth Circuit used language similar to *Mena's*, stating "although Panama gave its consent after [the defendants] had set to sea, they took the risk of such consent being given." *Aikins,* 946 F.2d at 613 (1990) (citing *Mena,* 863 F.2d at 1528.).

not an individual defendant, may object to the timing of the search. As the cases indicate, if a flag nation objects to the boarding of one of its vessels, then it may express its protestation by not consenting to the enforcement of U.S. law as required by § 1903. It is on this ground—lack of consent from the flag nation—that a defendant may challenge jurisdiction under § 1903, not on the ground that the flag nation's consent was late. Section 1903, properly construed, allows a defendant to challenge the jurisdictional requirement regarding *whether* the flag nation consented but *not* as to the *timing* or procedures involved with that consent.

*United States v. Gonzalez,* 776 F.2d 931 (11th Cir.1985), supports this reading of §.1903. In *Gonzalez,* a case relied upon by the *Mena* Court, the Eleventh Circuit applied § 1903's predecessor, the Marijuana on the High Seas Act, 21 U.S.C. § 955a(c). In that case, the Coast Guard boarded and searched a Honduran vessel after observing "bale type objects" on the deck. The search revealed 114 bales of marijuana. The Coast Guard then checked the ship's documentation. After determining that the vessel was registered to Honduras, the Coast Guard contacted the Honduran government and waited on board for consent. The Honduran government responded that it had no objection to the boarding, search, seizure, and prosecution of the crew members.

In *Gonzalez,* as in this case, the consent to board, seize, and search the ship came *after* the Coast Guard boarded and searched the ship. The Court denied the defendants' motion to dismiss noting that "consent . . . is a diplomatic requisite illustrating the international partnership that ensures the rule of law on the high seas." *Gonzalez* at 940 (emphasis removed).[10] The Court then implied that if the consent

had not been obtained from Honduras, the case would have to be dismissed. *See, id.* (stating that "the law will not be enforced on the high seas against a foreign nation's vessels without that nation's consent").

Other cases offer additional support for the proposition that a defendant cannot challenge the procedures or timing of the flag nation's consent. In *United States v. Reeh,*[11] 780 F.2d 1541 (11th Cir.1986), the Court held that consent from Britain two days after the Coast Guard boarded and searched a U.K. flag vessel was not ineffectual. The Court stated that "[w]hat is important is that the United Kingdom ratified the decision to board *before this case came to trial.*" *Id.* at 1547 (emphasis supplied). The Court then noted that any evidence obtained based on anticipated consent that never materialized would have to be excluded. *Id. See also, United States v. Biermann,* 678 F.Supp. 1437, 1441–3 (N.D.Cal.1988), *aff'd,* 905 F.2d 245 (9th Cir. 1990) (defendants lacked standing to challenge *procedural* requirements of § 1903); *United States v. Barrio–Hernandez,* 655 F.Supp. 1069 (D.Puerto Rico 1987) (District Court held that consent to enforce U.S. law coming two days after boarding was valid under the predecessor to § 1903 and the Court did not lack subject matter jurisdiction).

In summary, the applicable cases reveal that a defendant may object only to lack of his flag nation's consent and may not object to the timing of that consent or the procedures by which that consent was obtained. If the conduct of the United States government was outrageous or offensive, the flag nation, to whom the benefit of the statute runs, may refuse consent and deprive United States courts of jurisdiction. In this case, however, St. Vincent consented to the search, seizure, and enforcement

**10.** Once again, the jurisdictional question was not discussed by the Court. Because *Gonzalez* applied not § 1903 but its predecessor, the Court considered principles of international law not applicable in this case. It should be noted, however, that Congress enacted § 1903 to make it easier to bring high seas drug carriers to justice than it was under the predecessor act. *See,* 46 U.S.C.App. § 1903(d); Note, *Survey of*

*the United States Jurisdiction over High Seas Narcotics Trafficking,* 19 Ga.J. Int'l & Comp.L. 119, 122–3 (1989).

**11.** Again, this case was considered under § 1903's predecessor act. Unlike this case, the Court analyzed the consent issue under a constitutional framework.

of U.S. law to the Lucky Star. Had St. Vincent been unhappy with the United States' boarding and searching the Lucky Star it could have withheld consent under § 1903. In such a case this Court would be divested of subject matter jurisdiction and would be required to dismiss the case. However, St. Vincent did consent to the enforcement of U.S. law and therefore this Court retains subject matter jurisdiction.[12]

c. Ex Post Facto.

Defendants also contend that § 1903 is being applied to them *ex post facto*. They argue that their act of possessing 70 tons of hashish in international waters only became illegal when St. Vincent consented to the application of § 1903.

 A law is considered *ex post facto* when that law criminalizes conduct which was innocent before the law is passed. *United States v. Gonzalez*, 776 F.2d at 938. In other words, for Defendants to successfully challenge § 1903 on *ex post facto* grounds, they would have to show that their conduct was innocent when the Coast Guard boarded the Lucky Star and that the passage of § 1903 subsequently made that innocent conduct criminal.

 Section 1903 clearly defines as criminal the possession of 70 tons of hashish with the intent to distribute. This conduct was criminal under § 1903 when Defendants left Asia and headed east towards the United States. *See, United States v. Mena*, 863 F.2d at 1528 ("The conduct prohibited by [§ 1903] . . . was clearly defined before the defendants embarked on their voyage."). As discussed in the preceding section, the consent is not invalid because it was obtained after the Coast Guard boarded the Lucky Star. Defendants assumed the risk that St. Vincent would consent to the enforcement of U.S. law. St. Vincent's consent does not render § 1903 an *ex post facto* law. *United States v. Aikins*, 946

F.2d at 613 ("The statute [§ 1903] is not applied to the defendants ex post facto; although Panama gave its consent after they had set to sea, they took the risk of such consent being given." *Id.* (citing *Mena, supra*)).

*3. Violation of International Law.*

 Defendants further claim that the this Court lacks jurisdiction because the seizure of the Lucky Star "was performed in direct contravention of the exclusive jurisdiction of its flag state under Article 6 of the Convention on the High Seas." Defendant Rasheed's Motion to Dismiss at 12–13.

 This argument merits little discussion. Section 1903(d) clearly divests a defendant from raising violations of international law to defeat jurisdiction. Section 1903(d) provides,

A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest a court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter.

46 U.S.C.App. § 1903(d). Consequently, whether the seizure of the Lucky Star violated international law is irrelevant to this Court's decision and does not provide Defendants a basis for relief.

*4. Violation of the Posse Comitatus Act and 10 U.S.C. § 375.*

Defendants challenge the Navy's involvement in apprehending the Lucky Star. They argue that the Navy's actions violate the Posse Comitatus Act, 18 U.S.C. § 1385, and a related statute, 10 U.S.C. § 375. Based on these alleged violations, Defendants assert that "exclusion of all evidence and dismissal of the case is mandated." Defendant Rasheed's Motion to Dismiss at 11. In support of their contention, Defendants rely primarily upon two cases: *Unit-*

---

**12.** The Court notes that whether the flag nation's consent is a question of law or fact is an unresolved issue in this Circuit. However, the Court need not determine that issue in this Order. For the purposes of this ruling, the Court finds that St. Vincent did consent to the application of United States law. However, consent may be challenged at trial, when the Court will determine whether a flag nation's consent is a question of law for the Court's consideration or a question of fact for the jury to decide.

ed *States v. Roberts*, 779 F.2d 565 (9th Cir.), *cert. denied*, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986) and *United States v. Yunis*, 924 F.2d 1086 (D.C.Cir. 1991) both of which definitively state that the Posse Comitatus Act does not apply to the Navy and, in any event, the exclusionary rule does not apply to violations of either of the Acts cited by Defendants.

■ The Posse Comitatus Act does not apply in this case. The Posse Comitatus Act provides,

> Whoever ... willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385. The Ninth Circuit has held that this act does not apply to the Navy. "By its express terms, this act prohibits only the use of the Army and the Air Force in civilian law enforcement. We decline to defy its plain language by extending it to prohibit use of the Navy." *United States v. Roberts*, 779 F.2d at 567. Thus, the Posse Comitatus Act is not applicable here.

Defendants also assert that the use of the Navy violated 10 U.S.C. § 375 which requires the Secretary of Defense to issue regulations prohibiting "direct participation" by military personnel, including Navy personnel, in a civilian "search, seizure, arrest, or other similar activity." Defendants seek exclusion of all evidence and dismissal of the indictment.

■ Preliminarily, the Court notes that, as a matter of law, Defendants are not entitled to exclusion of evidence and/or dismissal for violations of § 375. The controlling case law from the Ninth Circuit is clear: Violations of 10 U.S.C. § 375 do not warrant exclusion of evidence or dismissal of the indictment. In *Roberts*, the Ninth Circuit found a violation of 10 U.S.C. § 375 where the Navy and Coast Guard boarded, searched, seized, towed, and later destroyed a boat laden with marijuana. Notwithstanding a finding that the Navy violated the act, the Ninth Circuit refused to suppress any evidence or dismiss the indict-

ment. The Court held that "an exclusionary rule should not be applied to violations of 10 U.S.C. §§ 371–378 until a need to deter future violations is demonstrated." *Roberts*, 779 F.2d at 568. Since, and before, *Roberts* was decided, no Ninth Circuit cases have applied the exclusionary rule to violations of §§ 371–378. It may be inferred that there is now no such need to deter future violations. *Accord, United States v. Yunis*, 924 F.2d 1086 (D.C.Cir. 1991) which held

> Reliance on this provision [10 U.S.C. § 375] faces the same remedial hurdle as direct reliance on the Posse Comitatus Act: Under the *Ker–Frisbie* doctrine, outright dismissal of the charges ... would not be an appropriate remedy.... Nor would a violation of the regulations at issue amount to a constitutional violation, making application of an exclusionary rule or similar prophylactic measures inappropriate.

*Id.* at 1094 (citing *United States v. Crews*, 445 U.S. 463, 473, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *United States v. Caceres*, 440 U.S. 741, 752–54, 99 S.Ct. 1465, 1472–73, 59 L.Ed.2d 733 (1979)). Accordingly, assuming *arguendo* that the Navy activity in this case violated 10 U.S.C. § 375, exclusion of any evidence or dismissal of the indictment would not be appropriate.

In any event, the Court finds that the Navy's involvement in this case did not violate the proscriptions of 10 U.S.C. § 375. After *Roberts* was decided, Congress expanded the allowable amount of Armed Forces involvement in civilian law enforcement. Congress explicitly authorizes the use of Navy equipment and personnel in enforcement of the Maritime Drug Law Enforcement Act, *i.e.* § 1903. 10 U.S.C. § 374(b)(1)(A) and § 374(b)(4)(A)(iv). In connection with enforcing § 1903, the Navy may be used to assist law enforcement by (A) detecting, monitoring, and communicating the movement of sea traffic; (B) participating in aerial reconnaissance; (C) interception of vessels detected outside the territorial jurisdiction of the U.S.; and (D)

communication with such vessels. 10 U.S.C. § 374(b)(2)(A)–(D).

In this case, the Navy assisted the Coast Guard by providing ships, communication on the Lucky Star's location, aerial reconnaissance by helicopter, and interception of the Lucky Star. Although many of the boarding party members were Navy personnel, they were, at all times, acting under the tactical command of U.S. Coast Guard LTJG Eyler. While the Navy personnel did carry guns, the guns were never brandished. Only Coast Guard personnel searched the vessel and ultimately arrested the Defendants; the Navy only provided logistical support and backup security. The Court finds that the Navy's role in the Lucky Star operation was passive and did not amount to direct participation in the search, seizure or arrests in this case.

## B. MOTIONS TO QUASH ARREST AND SUPPRESS EVIDENCE

Defendants claim that the Coast Guard's search and seizure of the Lucky Star violated the Fourth Amendment. Defendants argue (1) that when the Coast Guard "stopped" and boarded the Lucky Star, the Defendants' Fourth Amendment rights were violated; and (2) that the Coast Guard's search of Defendants' personal living quarters was a violation of their Fourth Amendment rights.

■ Defendants' arguments lack basis in the law. The Ninth Circuit has held that the Fourth Amendment does not apply to the search of non-resident aliens on a ship in international waters. *United States v. Aikins*, 946 F.2d 608, 613 (9th Cir.1990); *United States v. Davis*, 905 F.2d 245, 251 (9th Cir.1990) (citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 1061, 108 L.Ed.2d 222 (1990)). Defendants are non-resident aliens and the boarding and search of the Lucky Star occurred in international waters. Therefore, Defendants cannot challenge board-

ing or search of the Lucky Star by the Coast Guard.[13]

■ Alternatively, the Court finds that the search of Defendants' private living quarters is justified as a "border search." "Customs officials may ... conduct a border search of any ship arriving in port which is known to have sailed from international waters." *United States v. Dobson*, 781 F.2d 1374, 1376 (9th Cir.1986). It is uncontested that the Lucky Star arrived from international waters. Thus, the search of the Lucky Star's living quarters may properly be termed a border search.

■ A border search is *per se* constitutional and need not be supported by a warrant or reasonable suspicion. As the *Dobson* Court described it, "[a] border search is by its very nature reasonable under the fourth amendment, and requires neither a warrant, probable cause, nor even articulable suspicion." *Id.* (citing *United States v. Ramsey*, 431 U.S. 606, 614–18, 97 S.Ct. 1972, 1978–80, 52 L.Ed.2d 617 (1977); *accord, United States v. Troise*, 796 F.2d 310 (9th Cir.1986) (border searches "need not be based on a warrant or probable cause, or even on mere suspicion." *Id.* at 313.). Therefore, if the search occurred at or near the U.S. border, it was constitutional as a border search.

## III. CONCLUSION

Based upon the foregoing discussion, the Court denies Defendants' motions to dismiss and motions to quash arrest and suppress evidence. In addition, the Court defers ruling on Defendants' motion in limine.

---

**13.** Even if Defendants were permitted to challenge the Coast Guard's actions, their challenge would be unsuccessful. The undercover agents working on this case knew that the Lucky Star was carrying 70 tons of hashish. Such knowledge would constitute probable cause to stop the vessel. Moreover, once boarding the Lucky Star, the Coast Guard had the right to conduct a safety sweep to check for weapons. Thus, were it applicable in this case, the Fourth Amendment would provide Defendants no relief.