UNITED STATES of America,
Plaintiff–Appellee,

v.

Peter Malcolm DAVIS,
Defendant–Appellant.

No. 88–1446.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 15, 1989.

Decided May 21, 1990.

Michael Stepanian, Law Office of Michael Stepanian, and C. Zadik Shapiro, Law Office of C. Zadik Shapiro, San Francisco, Cal., for defendant-appellant.

Jeffrey W. Lawrence, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before WIGGINS and KOZINSKI, Circuit Judges and STOTLER, District Judge.*

WIGGINS, Circuit Judge:

Peter Malcolm Davis appeals his convictions for possession of, and conspiracy to possess, marijuana on a vessel subject to the jurisdiction of the United States with intent to distribute in violation of the Maritime Drug Law Enforcement Act, 46 U.S.C. app. §§ 1903(a), 1903(j) (Supp.IV 1986). The Coast Guard apprehended Davis on the high seas and he contests application of the Maritime Drug Law Enforcement Act to him. Furthermore, he alleges that the Coast Guard searched and seized his vessel in violation of the fourth amendment.

## I. FACTS AND PROCEEDINGS

On June 15, 1987, the Coast Guard cutter *Cape Romain* encountered the *Myth of Ecurie* ("*Myth*"), approximately 35 miles southwest of Point Reyes, California. The *Myth* is a sailing vessel approximately 58 feet in length. The *Myth* was headed in the direction of San Francisco. The *Cape Romain* approached the *Myth*, and Coast Guard personnel by radio requested permission to board. Peter Davis, the captain of the *Myth*, denied the request. He stated that the Coast Guard had no authority to board his boat because it was of British registry and was sailing on the high seas having departed from Hong Kong. Captain Davis announced his intention to alter his course for the Caribbean by way of Mexico.

The Coast Guard suspected the *Myth* of smuggling contraband. Factors leading to that suspicion were that the El Paso Intelligence Center had included the *Myth* on a list of vessels suspected of drug smuggling; the *Myth* was sailing in an area in which sailing vessels were infrequently found; and the *Myth* appeared to be carrying cargo.

The Coast Guard then requested permission from the United Kingdom to board the *Myth* in accordance with procedures in a 1981 agreement between the United States and the United Kingdom. The Coast Guard informed the British officials of the circumstances which led the Coast Guard to believe the *Myth* contained contraband material. By telex message, the United Kingdom gave the Coast Guard permission to board the *Myth* according to the terms of the 1981 Agreement.

On June 16, 1987, crew members from the *Cape Romain* boarded the *Myth*. By that time, the *Myth* had sailed to a location approximately 100 miles west of the California coast. The boarding officer smelled marijuana in the cabin of the *Myth*. Davis informed the boarding officer that he kept a shotgun below deck, and Davis and the boarding officer went below to obtain it. Below deck, the boarding officer saw numerous bales of material and smelled marijuana. Davis admitted that the bales were marijuana. The Coast Guard then arrested Davis and his crew and brought the *Myth* to the Coast Guard station on Yerba Buena Island in San Francisco. The Coast Guard there confiscated over 7,000 pounds of marijuana from the *Myth*.

Davis is not a citizen of the United States.

On September 2, 1987, Davis filed a motion to dismiss for lack of jurisdiction and a motion to suppress evidence obtained from the *Myth*. The district court denied both motions. *United States v. Biermann*, 678 F.Supp. 1437 (N.D.Cal.1988). On July 26, 1988, the district court found Davis guilty on stipulated facts. Davis timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982).

## II. DISCUSSION

### A. LEGISLATIVE JURISDICTION

Davis contends that the provisions of the statute under which he was convicted, the Maritime Drug Law Enforcement Act, 46 U.S.C. app. §§ 1903(a), 1903(j), do not apply to persons on foreign vessels outside the territory of the United States. The question of whether the United States may pun-

---

* Hon. Alicemarie H. Stotler, United States District Judge for the Central District of California, sitting by designation.

ish Davis' conduct involves three issues: 1) whether Congress has constitutional authority to give extraterritorial effect to the Maritime Drug Law Enforcement Act; if so, 2) whether the Constitution prohibits the United States from punishing Davis' conduct in this instance; and, if not, 3) does the Maritime Drug Law Enforcement Act apply to Davis' conduct?

 Whether Congress may give extraterritorial effect to the statute in question is an issue of law which we review de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Whether application of a particular statute violates due process is a mixed question of law and fact which we review de novo. *Id.* at 1202.

1. *Congressional Authority to Give Extraterritorial Effect to the Maritime Drug Law Enforcement Act*

 The Maritime Drug Law Enforcement Act, 46 U.S.C. app. § 1903(a) and (j) state:

(a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

(j) Any person who attempts or conspires to commit any offense defined in this Act [46 U.S.C. app. §§ 1904] is punishable by imprisonment or fine, or both, which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt of the conspiracy.

The United States Congress sits as a legislature of enumerated and specific powers. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). The Constitution gives Congress the power to "define

and punish piracies and felonies on the high seas...." U.S. Const. Art. I, sec. 8, cl. 10. The high seas lie seaward of the territorial sea, defined as the three mile belt of sea measured from the low water mark. *United States v. Rubies*, 612 F.2d 397, 402 n. 2 (9th Cir.1979). We therefore find that the Constitution authorized Congress to give extraterritorial effect to the Act.

2. *Constitutional Restrictions on the United States' Authority to Punish Davis' Conduct*

We next examine what limitations exist on the United States' power to exercise that authority.

 Contrary to Davis' assertions, compliance with international law does not determine whether the United States may apply the Act to his conduct.[1] Only two restrictions exist on giving extraterritorial effect to Congress' directives. We require Congress make clear its intent to give extraterritorial effect to its statutes. *United States v. Pinto–Mejia*, 720 F.2d 248, 259 (2nd Cir.1983). And secondly, as a matter of constitutional law, we require that application of the statute to the acts in question not violate the due process clause of the fifth amendment. *Thomas*, at 1068.

In this case, Congress explicitly stated that it intended the Maritime Drug Law Enforcement Act to apply extraterritorially. 46 U.S.C. app. § 1903(h) (Supp.IV 1986) ("This section is intended to reach acts of possession, manufacture, or distribution outside the territorial jurisdiction of the United States"). Therefore, the only issue we must consider is whether application of the Maritime Drug Law Enforcement Act to Davis' conduct would violate due process.

 In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a

---

1. International law principles, standing on their own, do not create substantive rights or affirmative defenses for litigants in United States courts. *United States v. Thomas*, 893 F.2d 1066, 1068–69 (9th Cir.1990).

sufficient nexus between the defendant and the United States, *see United States v. Peterson*, 812 F.2d 486, 493 (9th Cir.1987), so that such application would not be arbitrary or fundamentally unfair.[2]

■ In the instant case, a sufficient nexus exists so that the application of the Maritime Drug Law Enforcement Act to Davis' extraterritorial conduct does not violate the due process clause. "Where an attempted transaction is aimed at causing criminal acts within the United States, there is a sufficient basis for the United States to exercise its jurisdiction." *Id.* The facts found by the district court in denying Davis' motion to dismiss for lack of jurisdiction support the reasonable conclusion that Davis intended to smuggle contraband into United States territory. At the time of its first detection, the *Myth* was 35 miles away from, and headed for, San Francisco. As the Coast Guard approached, the *Myth* changed its course for the Caribbean by way of Mexico, although the *Myth* was many miles from the Great Circle route from Hong Kong to Acapulco. The *Myth* is on a list of boats suspected of drug smuggling. It is unusual for a 58 foot sailing vessel to have sailed from the *Myth*'s asserted point of departure, Hong Kong. The foregoing evidence is sufficient to establish a nexus between the *Myth* and the United States. We therefore find that the Constitution does not prohibit the application of the Marijuana Drug Law Enforcement Act to Davis.

### 3. *Application of the Maritime Drug Law Enforcement Act to Davis' Conduct*

We must next determine whether the Maritime Drug Law Enforcement Act by its terms applies to Davis' conduct. We hold that it does. Section 1903(a) and (j) proscribe possession and conspiracy to possess marijuana with intent to distribute on board a vessel subject to the jurisdiction of the United States. Section 1903(c)(1)(D) defines vessels subject to the jurisdiction of the United States as vessels "located within the customs waters of the United States." In the case of a foreign vessel, 19 U.S.C. § 1401(j) (1982) defines customs waters as follows:

> The term "customs waters" means, in the case of a foreign vessel subject to a treaty or some other arrangement between a foreign government and the United States enabling or permitting the authorities of the United States to board, examine, search, seize, or otherwise to enforce upon such vessel upon the high seas the laws of the United States, the waters within such distance of the coast of the United States as the said authorities are or may be so enabled or permitted by such treaty or arrangement.

. . . . .

Prior to boarding the *Myth*, the Coast Guard obtained permission to board from the United Kingdom in a telex which allowed the United States Coast Guard to board, search and seize the *Myth* in accord-

---

**2.** Some of our previous decisions have discussed international law jurisdictional principles simultaneously with the constitutionality of Congress' exercise of jurisdiction. *See Peterson*, 812 F.2d at 494 (extraterritorial application of statute is justified by protective principle and is constitutional); *Chua Han Mow v. United States*, 730 F.2d 1308, 1312 (9th Cir.1984) (extraterritorial application of statute is justified by objective territorial and protective principle and is constitutional), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985); *United States v. King*, 552 F.2d 833, 851–52 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (extraterritorial application of statute is justified by nationality and objective territorial principles and is constitutional); *United States v. Cotten*, 471 F.2d 744, 749 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973) (extraterritorial application of statute justified by objective territorial principle); *Rocha v. United States*, 288 F.2d 545, 549 (9th Cir.), *cert. denied*, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961) (extraterritorial application of statute is justified by protective principle). International law principles may be useful as a rough guide of whether a sufficient nexus exists between the defendant and the United States so that application of the statute in question would not violate due process. *See, e.g., Peterson*, 812 F.2d at 493. However, danger exists that emphasis on international law principles will cause us to lose sight of the ultimate question: would application of the statute to the defendant be arbitrary or fundamentally unfair?

ance with the terms of the 1981 Agreement.

■ Whether the consent given by the United Kingdom constitutes an arrangement pursuant to section 1401(j) presents a question of law subject to de novo review. *See United States v. Bent–Santana,* 774 F.2d 1545, 1548 (11th Cir.1985). We have held that informal arrangements can satisfy section 1491(j). *See, e.g., Peterson,* 812 F.2d at 493 (Panamanian consent by telex constituted an arrangement satisfying section 1491(j)). As long as the foreign government has made clear its indication of consent, the arrangement necessary to create customs waters around a specific vessel may be informal. *See United States v. Gonzalez,* 776 F.2d 931, 933 (11th Cir.1985); *United States v. Alomia–Riascos,* 825 F.2d 769, 771 (4th Cir.1987). An arrangement is simply a settlement or adjustment and contemplates no particular form. *Gonzalez,* 776 F.2d at 936. Thus, even verbal, ad hoc consent by a vessel's flag country is sufficient to bring the vessel within the definition of customs waters. *See, Bent–Santana,* 774 F.2d at 1550; *Alomia–Riascos,* 825 F.2d at 771.

The telex sent by the United Kingdom stated:

> 1. HMG has verified registry of subj vessel and has authorized USG to board, search and seize, if evidence warrents [sic], under U.S. Law. HMG has indicated that the conditions and terms contained in 13 Nov 81 US/UK Agreemnt [sic] will be used in this case.
>
> 2. In view of the above, comdt has no objection to taking action against subj vessel under the terms of the US/UK Agreement.
>
> 3. Insure Amenbassy [sic] London is info addee on all related msc traffic.

*Biermann,* 678 F.Supp. at 1442 n. 2. We hold that the request for permission to board and the United Kingdom's reply telex constitutes an arrangement pursuant to section 1401(j). Therefore, Davis' vessel was located within the customs waters of the United States, and hence within its jurisdiction.

■ Davis argues that the Coast Guard failed to conduct its search pursuant to the terms and conditions of the 1981 Agreement, thereby vitiating the consent given by the United Kingdom.[3] In order to board a vessel of British registry, the 1981 Agreement requires that authorities of the United States "reasonably believe that the vessel has on board a cargo of drugs for importation into the United States."

Reasonable suspicion must be based upon "specific articulable facts, together with rational inferences from those facts." *United States v. Reeh,* 780 F.2d 1541, 1544 (11th Cir.1986). Reasonable suspicion turns on the totality of particular circumstances. *Id.* We hold that the Coast Guard had reasonable suspicion to believe that the *Myth* was importing drugs. The listing of the *Myth* as a boat suspected of smuggling, the *Myth's* unusual location, its attempt to change course, and its lowered position in the water, indicating that it was carrying cargo, could reasonably lead a Coast Guard officer to believe the *Myth* was smuggling contraband. We thus find that the Coast Guard satisfied the conditions of the United Kingdom's consent.

## B. THE VALIDITY OF THE SEARCH AND SEIZURE OF THE MYTH

Whether the Coast Guard acted lawfully in stopping, boarding, and searching the *Myth* is a mixed question of fact and law which we review de novo. *United States v. Dobson,* 781 F.2d 1374, 1376 (9th Cir. 1986). We uphold findings of fact the district court used in denying a motion to suppress unless they are clearly erroneous. *See United States v. Feldman,* 788 F.2d 544, 550 (9th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

---

**3.** At the outset, we note that a question exists as to whether the 1981 Agreement even applies to vessels found within the Pacific Ocean. *See Biermann,* 678 F.Supp. at 1442. However, since the telex states that the search be conducted according to "the terms and conditions" of the 1981 Agreement, we deem the United Kingdom waived the jurisdictional provisions of the 1981 Agreement and we interpret only the 1981 Agreement's substantive provisions.

 Davis contends that the Coast Guard illegally stopped, boarded, and searched the *Myth*. The Coast Guard acted under valid statutory authority pursuant to 14 U.S.C. § 89(a), which states:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, ... officers may go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

As discussed above, the United States had jurisdiction over the *Myth* because it was within the customs waters of the United States.

 Davis also contends that the search and seizure of the *Myth* violates the fourth amendment. We hold that the protections of the fourth amendment do not extend to the search of the *Myth* on the high seas. *See United States v. Verdugo–Urquidez*, — U.S. —, 110 S.Ct. 1056, 1061, 108 L.Ed.2d 222 (1990). Although *Verdugo–Urquidez* only held that the fourth amendment does not apply to searches and seizures of nonresident aliens in foreign countries, the analysis and language adopted by the Court creates no exception for searches of nonresident aliens on the high seas. *See id.* (No indication that fourth amendment was intended to protect aliens in international waters).[4]

### III. CONCLUSION

We find that Congress had the authority to enact the Maritime Drug Law Enforcement Act and that it is constitutionally

applied to defendant. Furthermore, because the fourth amendment does not extend to the search of nonresident aliens on the high seas, no fourth amendment violation occurred in the search of the *Myth*. Davis' convictions are AFFIRMED.

---

**4.** *Verdugo–Urquidez* applies retroactively to this appeal. We apply the Supreme Court's fourth amendment decisions to cases still pending on direct appeal unless they represent a "clear break with the past." *United States v. Gallop*, 694 F.2d 205, 207 (9th Cir.1982). Because this court had not established any rule with regard to the applicability of the fourth amendment to searches on the high seas, *see Peterson*, 812 F.2d at 489 (merely assuming without deciding that fourth amendment protections apply on the high seas), our decision does not constitute a "clear break" with the past.