**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

           v.

LEI SHI,

           *Defendant-Appellant.*

No. 06-10389

D.C. No.
CR-02-00116-1-HG

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen Gillmor, District Judge, Presiding

Argued and Submitted
November 6, 2007—Honolulu, Hawaii

Filed April 24, 2008

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

DeAnna S. Dotson, Esq., Kapolei, Hawaii, argued the cause for the defendant-appellant and filed briefs.

Marshall H. Silverberg, Assistant United States Attorney, Honolulu, Hawaii, argued the cause for the plaintiff-appellee; Thomas J. Brady, Assistant United States Attorney, Honolulu, Hawaii, filed a brief for the plaintiff-appellee; Edward H. Kubo, Jr., United States Attorney, District of Hawaii, Honolulu, Hawaii, was on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether a foreign national who forcibly seizes control of a foreign vessel in international waters may be subject to the jurisdiction of the United States when such vessel is intercepted by federal authorities.

I

A

On March 14, 2002, the *Full Means No. 2*, a Taiwanese fishing vessel registered in the Republic of the Seychelles, was sailing in international waters off the coast of Hawaii. The Captain of the vessel was Taiwanese, while its 29 crew-members, including Lei Shi,[1] the ship's cook, were mainland Chinese. According to Shi, the Captain and First Mate beat and harassed him repeatedly and, on this date, demoted Shi

---

[1]There is some confusion between the parties and an ambiguity in the record as to whether the defendant's proper name is "Lei Shi" or "Shi Lei." We refer to the defendant by the former name, as it is the one most commonly used in the papers before us.

from the position of cook to deck hand, punctuating the decision with a beating that was particularly severe. A few hours later, Shi responded. He retrieved two large knives from the kitchen, ascended to the deck of the ship, and fatally stabbed both men.

According to the government, Shi then ordered the Second Mate to "drive the ship" and ordered the other crewmembers to throw the captain's body overboard. Shi stated he would kill anyone who disobeyed him and refused to let his fellow crewmates use the radio. Shi retained control of the ship for two days, setting a course for China and threatening to scuttle the vessel if his instructions were not obeyed.

On March 16, 2002, the crew overpowered Shi and imprisoned him in a storage compartment on the ship. The crew then set a course for Hawaii, though they never contacted the ship's parent company, apparently because none of them knew how to operate the radio. After several days of silence, the parent company notified the U.S. Coast Guard that the *Full Means No. 2* was missing and requested the Coast Guard's assistance in recovery.

On March 19, 2002, a Coast Guard cutter intercepted the ship approximately 60 miles from Hilo, Hawaii. Two of the *Full Means No. 2*'s crewmembers set out on a raft to meet the cutter, carrying a letter addressed to the Hawaiian government which described Shi's takeover. After the Republic of the Seychelles waived jurisdiction, the ship's acting master permitted the Coast Guard to board. The Coast Guard did not attempt to take control of the ship at the time because the officers decided first to determine whether the crew was staging an emergency to gain entry into the United States or whether a true exigency existed.

Among the officers who boarded the ship was Lt. Junior Grade Hsing-Yen John Fu, who spoke Mandarin Chinese. Lt. Fu came upon the storage compartment where Shi was

imprisoned and examined it from the outside. The crew had sealed the door to the compartment shut by welding a metal bar across its doorway. The door contained holes, however, through which Fu could see Shi sitting inside. Shi's hands were bound behind him with wire which appeared to be cutting his wrists. The compartment contained no windows or a toilet. Fu later testified that he believed the crew fed Shi through a hole in the door, although he did not personally witness such acts.

Because the Coast Guard had not yet assumed control of the vessel, the officers still considered Shi to be a prisoner of the crew. Accordingly, they did not immediately instruct the crew to release Shi from the compartment. Still, Lt. Fu insisted that the crew remove the wire restraints from Shi's hands. The crew obliged, and the wires were replaced with handcuffs.

On March 19 and 20, Lt. Fu stood outside the compartment and spoke to Shi through the holes in the door. He later testified that his decision to initiate contact with Shi was an effort to determine whether Shi could corroborate the story told by the crew. In the course of their exchanges, Shi told Lt. Fu that he had killed the Captain and First Mate. Fu never read Shi the *Miranda* warnings.

On March 21 at approximately 3:00 pm, FBI agents boarded the vessel and arrested Shi for violating 18 U.S.C. § 2280, which prohibits acts of violence that endanger maritime navigation. In addition, the agents obtained a warrant to search Shi's bunk area on the ship, where they discovered several incriminating letters Shi had written to his family.

Immediately upon releasing Shi from the storage compartment, the agents allowed Shi to use the bathroom. Next, they escorted him to the ship's dining area, where Agent Lynelle Torikai, through the assistance of Language Specialist Kipiu Wun, informed Shi of the charges against him and read him

his *Miranda* rights. In addition, the agents furnished Shi with an Advice of Rights waiver written in Mandarin. Shi expressed his willingness to answer questions, but called them "insignificant" and did not sign the form. Agent Torikai and Language Specialist Wun then explained the *Miranda* rights and the purpose of the form for approximately five minutes, after which Shi signed it.

Thereafter, a Coast Guard health technician examined Shi, treated his wrists with ointment, and wrapped them. The FBI then transported Shi to the federal building in Honolulu, where he was fed, permitted to use the restroom, and given a change of clothing. At approximately 5:30 pm, Shi was escorted to an interrogation room where Agent Torikai questioned him for approximately 4.5 hours. During such time, Shi was fed again, permitted two smoke breaks, and confessed to killing the Captain and First Mate.

B

The government filed an indictment charging Shi with several violations of § 2280, which proscribes certain acts of violence that endanger maritime navigation. The statute codifies the United States' obligations under the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation (the "Maritime Safety Convention"), 27 I.L.M. 672 (1988), which authorizes any signatory state to extradite or prosecute offenders, regardless of where the offender's acts occurred. Accordingly, § 2280 authorizes federal jurisdiction over any offender "later found" in the United States after a prohibited act is committed. 18 U.S.C. § 2280(b)(1)(C). In a published order, the district court concluded that it had jurisdiction under the statute. *United States v. Shi*, 396 F. Supp. 2d 1132 (D. Haw. 2003).

Next, the district court granted Shi's motion to suppress his unwarned statements to Lt. Fu on March 19 and 20, but denied his motion to suppress his subsequent confession to

Agent Torikai. The court also denied Shi's motion to exclude the personal letters the FBI agents seized from his bunk space, rejecting Shi's arguments that the warrant was invalid and that the scope of the search was overbroad.

Shi initially pled guilty, but soon withdrew the plea, and the government filed a superseding indictment.[2] The new indictment charged Shi with one count of seizing control over a ship by force, in violation of § 2280(a)(1)(A), and two counts of performing an act of violence likely to endanger the safety of the ship, in violation of § 2280(a)(1)(B). The indictment alleged that the acts charged in all three counts "resulted in death," elevating the maximum statutory penalty for each from 20 years to life in prison. The jury convicted Shi on all counts, and the district court sentenced him to 36 years in prison.

Shi timely filed this appeal, challenging (1) the district court's jurisdiction, (2) the sufficiency of the indictment, (3) the admissibility of his statement to Agent Torikai, (4) the admissibility of the letters seized from his bunk, and (5) the constitutionality of his sentence. We now turn to the merits of these claims.

II

We begin with Shi's contention that the district court lacked jurisdiction because he did not meet the jurisdictional prerequisites set forth in § 2280 and, in the alternative, because § 2280 is unconstitutional as applied to him. We consider Shi's constitutional argument first.

---

[2]Because Shi's appeal does not implicate the initial indictment, we refer to the first superseding indictment as "the indictment."

A

Section 2280 codifies the United States' obligations under the Maritime Safety Convention to extradite or to prosecute those who commit acts of maritime violence. Section 2280(a)(1) lists eight proscribed acts, and § 2280(b)(1) vests federal courts with jurisdiction if certain conditions are met. 18 U.S.C. § 2280. At issue here is the provision which renders jurisdiction proper if the "offender is *later found* in the United States." *Id.* § 2280(b)(1)(C) (emphasis added). The district court concluded that § 2280 provided it with jurisdiction over Shi because Shi's arrest and transport to Honolulu rendered him "later found" in the United States as the statute defines that term.

1

**[1]** Article I, Section 8, Clause 10 of the United States Constitution (the "Offense Clause") empowers Congress to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." Because the high seas, by definition, lie outside United States territory, *see United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990), the Offense Clause grants Congress the authority to apply federal law beyond the borders of the United States, *see EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991).

**[2]** Section 2280 is an exercise of Congress's constitutional authority to define and punish "Felonies on the high Seas" because it proscribes felony offenses and expressly applies to international waters. *See* 18 U.S.C. § 2280(e). In addition, §§ 2280(a)(1)(A) and (B), the provisions under which Shi was charged, proscribe offenses which meet the definition of piracy. "Piracy" traditionally has been defined as "robbery, or forcible depredations upon the sea." *United States v. Smith*, 18 U.S. 153, 161 (1820). "Depredation" is "the act of plundering, robbing, or pillaging." *Black's Law Dictionary* 397 (5th ed.

1979). All three acts require the use of force.[3] Section 2280(a)(1)(A) prohibits "seiz[ing] or exercis[ing] control over a ship by force or threat thereof," and § 2280(a)(1)(B) prohibits "act[s] of violence against a person on board a ship" that are "likely to endanger the safe navigation of that ship." Because such offenses involve interference with property on the open sea through the use of force, they are within Congress's power to define and to punish crimes of piracy. *See Smith*, 18 U.S. at 158-59 (treating "Piracies," "Felonies on the high Seas," and "Offenses against the Laws of Nations" as three separate offenses).

[3] In addition to the Offense Clause, Congress derived the authority to promulgate § 2280 by virtue of the Necessary and Proper Clause. That Clause empowers Congress "to make all Laws which shall be necessary and proper for carrying into execution . . . all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18. Such "Powers" include the Executive's Article II Treaty Power. *See Missouri v. Holland*, 252 U.S. 416, 432 (1920). Section 2280 implements the Maritime Safety Convention, an international accord which requires signatory states to "prosecute or extradite" offenders found within their territory regardless of where the offense was committed. *See United States v. Yousef*, 327 F.3d 56, 95-96 (2d Cir. 2003) (per curiam) (discussing a similar provision in the Montreal Convention). In order to satisfy this obligation, it was necessary for the United States to codify the Convention's "extradite or prosecute" requirement into federal law. Section 2280 accomplishes this

---

[3]The definition of "plunder" includes the taking of "property from persons or places by *open force*." *Id.* at 1039 (emphasis added). "Robbery" is the "[f]elonious taking of . . . [any] article of value, in the possession of another, from his person or immediate presence, and against his will, accomplished by means of *force or fear*." *Id.* at 1193 (emphasis added) (citations omitted). Finally, the act of "pillaging" is the "*forcible* taking of private property by an invading or conquering army from the enemy's subjects." *Id.* at 1033 (emphasis added).

task. Accordingly, the Treaty Power coupled with the Necessary and Proper Clause provided Congress with an additional source of authority to apply § 2280 beyond U.S. borders.

2

**[4]** Congress's constitutional authority to apply a federal law outside U.S. borders does not end our inquiry, however, because we may not presume that Congress intended to do so unless it clearly expresses such intent. *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993). Section 2280(b)(1) applies to "covered ships," which the statute defines as ships "navigating or . . . scheduled to navigate into, through or from waters beyond the outer limit of the territorial sea of a *single country*," 18 U.S.C. § 2280(e) (emphasis added). In addition, the statute provides federal jurisdiction over acts committed on such ships if "the offender is *later found* in the United States." *Id.* § 2280(b)(1)(C) (emphasis added). We are satisfied that these two provisions are a clear expression that § 2280 applies outside United States territory.

3

Even if Congress had the authority to apply § 2280 beyond the United States' borders and clearly manifested its intent to do so, Shi argues that the application of the statute to him violates the Due Process Clause of the Fifth Amendment. Shi points to our decision in *Davis*, in which we held that when the Maritime Drug Law Enforcement Act ("MDLEA") is applied to a foreign defendant apprehended on a foreign-flag ship, due process requires "a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." 905 F.2d at 249-50 (internal citation and footnote omitted). Shi argues that no such nexus exists here. Yet before we reach the question of whether a jurisdictional nexus exists, we must first determine whether such nexus is required.

**[5]** The Due Process Clause requires that a defendant prosecuted in the United States "should reasonably anticipate being haled into court in this country." *United States v. Moreno-Morillo*, 334 F.3d 819, 827 (9th Cir. 2003) (internal quotation marks and citation omitted). The MDLEA prohibits the possession of narcotics on the high seas. Because some states do not consider such conduct criminal, we held in *Davis* that due process requires a foreign defendant apprehended on a foreign flag ship to have some connection to the United States before he can be prosecuted in a domestic court.[4] 905 F.2d at 248-49. Yet in *United States v. Caicedo*, 47 F.3d 370 (9th Cir. 1995), we concluded that due process does not require any such nexus when the MDLEA is applied to foreign defendants apprehended on stateless vessels because "[s]uch vessels are international pariahs," that, "by attempting to shrug the yoke of any nation's authority, . . . subject themselves to the jurisdiction of all nations." *Id.* at 372 (internal quotation marks and citation omitted).

**[6]** We need not determine whether the *Full Means No. 2* was a foreign-flag or stateless vessel at the time it was intercepted by the Coast Guard in order to resolve this case. Instead, we abide by our instruction in *Caicedo* that "[a] nexus requirement, imposed as a matter of due process, makes sense when the 'rough guide' of international law also requires a nexus." *Id.*; *see also Davis*, 905 F.2d at 249 n.2 (explaining that while not binding, "[i]nternational law principles may be useful as a rough guide of whether a sufficient nexus exists between the defendant and the United States").

**[7]** In applying the "rough guide" of international law, we turn to the principle of universal jurisdiction. Universal jurisdiction is based on the premise that offenses against all states may be punished by any state where the offender is found. *See*

---

[4]Such nexus would be established, for example, if the foreign defendant's extraterritorial conduct is purposefully aimed at the United States. *See, e.g., United States v. Aikins*, 946 F.2d 608, 613-14 (9th Cir. 1990).

Stephen Macedo, *Universal Jurisdiction* 2-12 (2004). Accordingly, it allows a state to claim jurisdiction over such an offender even if the offender's acts occurred outside its boundaries and even if the offender has no connection to the state.

As explained above, the acts with which Shi is charged constitute acts of piracy. *See supra* at 4376-77. Prosecuting piracy was the original rationale for creating universal jurisdiction, *see, e.g.,* Kenneth C. Randall, *Universal Jurisdiction Under International Law*, 66 Tex. L. Rev. 785, 803 (1988) (citing piracy as the "archetypal universal crime"), and federal courts have historically accepted the notion that a pirate may be tried by any state, *see Smith*, 18 U.S. at 176 ("piracy . . . is an offense against the universal law of society, a pirate being, according to Sir Edward Coke, *hostis humani generis* [an enemy of the human race]") (quoting 4 *Blackstone's Commentaries* \*71, 73). Due process does not require a nexus between such an offender and the United States because the universal condemnation of the offender's conduct puts him on notice that his acts will be prosecuted by any state where he is found. *See United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (holding that inasmuch as a crime is "condemned universally by law-abiding nations, we see no reason to conclude that it is 'fundamentally unfair' for Congress to provide for the punishment" of offenders apprehended on the high seas).

**[8]** Sections 2280(a)(1)(A) and (B) prohibit interference with the safe navigation of a maritime vessel through the use or threat of force. Because these are acts of piracy, and because such acts are universally condemned, due process does not require the same nexus between the offender and the United States as does the MDLEA.

Moreover, due process does not require the same nexus between violators of § 2280 and the United States because § 2280 implements the Maritime Safety Convention, which

expressly provides foreign offenders with notice that their conduct will be prosecuted by any state signatory.[5] We acknowledge that in a similar case, the Second Circuit suggested that a jurisdictional nexus was required. In *Yousef*, a foreign national apprehended abroad was prosecuted in the United States for violating 18 U.S.C. § 32(b), which prohibits aircraft piracy, after he hijacked a Philippine Airlines flight. 327 F.3d at 56. The Second Circuit cited our decision in *Davis*, which applied a nexus requirement to a foreign defendant apprehended abroad and prosecuted under the MDLEA. *Id.* at 111. The court reasoned that such requirement was met in Yousef's case because his conduct was purposefully aimed at the United States: he previously hijacked aircrafts in the United States and his hijacking of the Philippine Airlines flight was a test-run for an attack in this country. *Id.* at 111-12.

The court's treatment of the due process question consisted of only three paragraphs of a 147-page opinion, however, and while the court cited our decision, *id.* at 111 (citing *Davis*, 905 F.2d at 248), it never considered the implications of our refusal to extend the nexus requirement to foreign defendants apprehended on stateless vessels in *Moreno-Morillo* and *Caicedo. See Moreno-Morillo*, 334 F.3d at 828; *Caicedo*, 47 F.3d at 372. Those decisions suggest that a nexus is not required when the offender's conduct is proscribed universally.

---

[5]This is not to suggest that the Convention creates "universal jurisdiction" over the crimes it proscribes. As the Second Circuit explained in interpreting an identical "extradite or prosecute" provision, "[w]hile the purpose of such treaties is to assure 'universal punishment of the offenses in question' . . . it is incorrect to speak of these treaties as creating 'universal jurisdiction,' or even 'treaty-based universal jurisdiction,' because the treaties create obligations only in States party to them, not universally in all states." *Yousef*, 327 F.3d at 95 n.29 (interpreting a nearly identical provision in the Montreal Convention). Instead, such accords amount to "jurisdictional agreement[s] among contracting States to extradite or prosecute offenders." *Id.* at 96.

The D.C. Circuit's decision *United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998), supports such conclusion. In that case, a foreign national was apprehended abroad and charged with hijacking an Air Egypt flight in violation of 49 U.S.C. app. § 1472(n) (1994). *Id.* at 1125. The D.C. Circuit concluded that federal jurisdiction over Rezaq was proper without noting any possible due process concerns. Although the court's silence may have stemmed from any number of reasons, it is important to note that, like § 2280, the statute in *Rezaq* was enacted to implement an international agreement to extradite and to prosecute perpetrators of widely-condemned conduct. (Section 1472(n) implemented the Hague Convention, which prohibits aircraft hijacking.)

**[9]** Congress's authority to apply § 2280 beyond United States borders stems in part from its power under the Offense Clause to punish "Piracies on the high Seas," not merely "Felonies," as Congress has done in statutes such as the MDLEA. Because piracy is a universally-condemned crime, a jurisdictional nexus is not required to satisfy due process. As such, we conclude that the universal condemnation of Shi's conduct and the existence of the Maritime Safety Convention provided him with all the notice due process requires that he could be prosecuted in this country. Accordingly, the district court's exercise of jurisdiction over Shi was "neither arbitrary nor fundamentally unfair." *Moreno-Morillo*, 334 F.3d at 828 n.7 (citing *Caicedo*, 47 F.3d at 372).

B

Having established that the district court's exercise of jurisdiction over Shi satisfied the Constitution's requirements, we next consider Shi's arguments that jurisdiction was improper under the statutory requirements set forth in § 2280, which permits jurisdiction if the "offender is *later found* in the United States." *Id.* § 2280(b)(1)(C) (emphasis added). The government contends that Shi's arrest and transport to the

Honolulu federal building brought him within the terms of this provision. Shi argues otherwise.

It is well-established that jurisdiction over a defendant is not impaired by the fact that he was brought within the jurisdictional territory of the court against his will. *See Frisbie v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinois*, 119 U.S. 436 (1886).[6] Yet Shi argues that § 2280 creates an exception to this rule because it requires the defendant to be "later found" in the United States. 18 U.S.C. § 2280(b)(1)(C). Accordingly, he reads the statute to require a defendant to enter the United States voluntarily before he can be prosecuted.

The D.C. Circuit rejected an identical argument launched against a similar statute. In *Rezaq*, a foreign defendant was arrested abroad and tried in the United States for violating 49 U.S.C. app. § 1472(n) (1994), an anti-hijacking statute. 134 F.3d at 1125. Section 1472(n) requires the defendant to be "afterwards found" in the United States and the defendant argued that this language required that he enter the United States voluntarily. The D.C. Circuit rejected this interpretation, holding that "the word 'found' means only that the hijacker must be *physically located* in the United States, not that he must be first detected here." *Rezaq*, 134 F.3d at 1132 (emphasis added).[7]

---

[6]Indeed, in certain circumstances, jurisdiction will satisfy due process even when a foreign national is forcibly abducted in another country by United States officials for the sole purpose of being brought to trial here. *See United States v. Alvarez-Machain*, 504 U.S. 655, 661-62 (1992).

[7]In a similar case, the Second Circuit in *Yousef* upheld jurisdiction over a foreign defendant under 18 U.S.C. § 32(b), which requires the defendant to be "afterwards found" in the United States. 327 F.3d at 88. In that case, the defendant was arrested in Pakistan and transferred to the United States on charges relating to his role in the 1993 World Trade Center bombing. *Id.* at 78-80. Subsequent to his arrival, the government added charges under § 32(b) for the unrelated bombing of a Philippine Airlines plane. *Id.* The defendant argued that jurisdiction was improper under § 32(b)'s "af-

**[10]** We are persuaded by this analysis, and conclude that the requirement that a defendant be "later found" does not contain the implicit requirement that the defendant's arrival in the United States be voluntary. Indeed, if Congress intended to create such an exception to the *Ker-Frisbie* rule, we would expect it to manifest its intent more directly. Moreover, the Maritime Safety Convention contains no such voluntary entry requirement. *See* Maritime Safety Convention, art. 9. To the extent Congress intended § 2280 to deviate from the Convention it was designed to implement, we would expect such an instruction to be express.

**[11]** Accordingly, we conclude that Shi's arrest on the *Full Means No. 2* after the United States had established jurisdiction over the ship and his subsequent transport to the Honolulu federal building rendered him "later found" in the United States and subjected him to jurisdiction under § 2280. With the propriety of the district court's jurisdiction now established, we turn to Shi's additional challenges to his conviction.

### III

Shi next argues that the indictment against him was insufficient. The indictment contained every element of

---

terwards found" provision because he did not enter the United States voluntarily. *Id.* at 88. The Second Circuit disagreed, noting that "[b]y the time Yousef was charged with the crime . . . he was already lawfully in federal custody in the United States." *Id.* at 89. While the court's reasoning suggests that the voluntariness of the defendant's arrival was irrelevant to determining whether he was "afterwards found" in the United States, *id.* at 89-90, the court considered the fact that Yousef was not charged under § 32(b) until *after* he was inside the United States to be of some significance, *id.*; *see also United States v. Yunis*, 924 F.3d 1086 (D.C. Cir. 1991) (holding that a foreign defendant was subject to jurisdiction under § 1472(n) even though he did not enter the United States voluntarily, but noting the fact that the defendant was already inside U.S. territory before he was charged).

§§ 2280(a)(1)(A) and (B), the offenses with which Shi was charged. As such, it fairly informed him of the charges against him and "enable[d] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Vroman*, 975 F.2d 669, 670-71 (9th Cir. 1992) (internal quotation marks and citation omitted). Yet Shi contends that the indictment was flawed because it failed to allege that he engaged in acts of terrorism.[8] Sections 2280(a)(1)(A) and (B) contain no such requirement.

[12] The face of the statute does not reference "terrorism" or suggest that its scope is limited to terrorist acts. Moreover, the statutory context does not indicate that such limitation exists. Section 2280 is codified in Title 18, Part I, Chapter 111 of the U.S. Code, which describes offenses related to "Shipping." A separate Chapter defines offenses related to "Terrorism." *See* Title 18, Part I, Chapter 113b. Shi correctly notes that a violation of § 2280 is one of several offenses which may constitute a "federal crime of terrorism," but fails to note that such classification requires additional statutory showings. *See* 18 U.S.C. § 2332b(g)(5)(B)(i) (listing § 2280 as one offense which may be prosecuted as a "federal crime of terrorism" if such offense is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"). That a violation of § 2280 may be a "federal crime of terrorism" in certain cases does not imply that "terrorism" is an element of the crime. Accordingly, we conclude that the indictment against Shi was sufficient.

---

[8]We reject Shi's separate argument that the indictment was insufficient because it failed to allege that the deaths of the Captain and First Mate occurred "in connection with" Shi's acts. Sections 2280(a)(1)(A) and (B) contain no such language. We also reject Shi's argument that the indictment was insufficient because it failed to allege the requisite state of mind. Section 2280(a)(1) requires the defendant to act "unlawfully and intentionally." All three counts of the indictment include this exact phrase.

IV

We next turn to Shi's argument that the district court erred in admitting his March 21 confession to Agent Torikai into evidence. Shi argues that such confession was inadmissible because (1) it was tainted by his unwarned statements to Lt. Fu on March 19 and 20; (2) Shi did not adequately waive his *Miranda* rights upon his arrest; (3) Shi invoked his right to silence, and (4) the confession was involuntary. We consider each argument in turn.

A

Shi made statements to Lt. Fu on March 19 and 20 without the benefit of *Miranda* warnings.[9] The next day, after he received the warnings, Shi confessed to Agent Torikai. The Supreme Court has held that when a defendant's properly-warned confession is preceded by an unwarned statement or statements, the confession may only be admitted if both the pre-warning statements and the confession were voluntary, or if the confession was sufficiently separated from the pre-warning statement such that the "causal connection" between the two statements would be "speculative and attenuated." *Oregon v. Elstad*, 470 U.S. 298, 313-14 (1985); *see Missouri*

_____

[9]At the time of Shi's statements to Lt. Fu, he remained a prisoner of the crew. We have held that an officer's obligation to administer *Miranda* warnings attaches only where the suspect is in custody. *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (citations omitted). In asking this question, we examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position. *Id.* (citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). In this case, Shi was unquestionably in custody, but he was in the custody of the crew of the *Full Means No. 2*, not the United States. In such an unusual circumstance, it is not clear whether *Miranda* warnings are required. Because we are only asked to decide whether Shi's statements to Lt. Fu tainted his later confession to Agent Torikai, we decline to resolve such question here. Instead, we assume, without deciding, that *Miranda* warnings were required.

*v. Seibert*, 542 U.S. 600, 619-20 (2004) (Kennedy, J., concurring).

Although the district court concluded that Shi's statements to Lt. Fu on March 19 and 20 were voluntary, it assumed for purposes of this analysis that the statements were involuntary because of the poor conditions of the storage compartment in which Shi was confined at the time. We proceed on the same assumption. As such, Shi's confession to Agent Torikai is admissible only if it was sufficiently attenuated from his March 19 and 20 statements.

In undertaking this analysis, we consider (1) the temporal proximity between the statements; (2) the intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *United States v. Jenkins*, 938 F.2d 934, 941 (9th Cir. 1991) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). Our examination of the degree of attenuation "is merely another way of asking whether the subsequent confession was, itself, voluntary." *Id.*

In this case, one full day elapsed between Shi's March 20 statement to Lt. Fu and his properly-warned confession. In addition, several significant intervening events separated the pre-warning statements from Shi's properly warned confession. First, Shi's unwarned statements were made to Coast Guard Lt. Fu, while his properly-warned confession was made to FBI Agent Torikai. Second, Shi's unwarned statements were made on board the *Full Means No. 2*, while his Mirandized confession was made at the Honolulu federal building. Third, during the time that elapsed between Shi's March 20 statement and his confession, Shi was fed, treated by a health technician, given a change of clothes, and twice permitted access to a restroom.

**[13]** In addition to these intervening events, we note that Shi's unwarned statements were not the product of purposeful or flagrant official misconduct. *See id*. Lt. Fu spoke to Shi

before the Coast Guard had exercised jurisdiction over the *Full Means No. 2* and testified that his purpose in engaging Shi was not to ascertain his guilt, but to determine whether Shi would corroborate the crew's story or whether the crew was simply staging the emergency. As the Supreme Court has explained, "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigator's process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Elstad*, 470 U.S. at 309. Even if Lt. Fu's decision to speak with Shi without first reading the *Miranda* warnings was imprudent, we cannot conclude that it was calculated to overcome Shi's exercise of his free will. Accordingly, we conclude that whatever taint was caused by Shi's unwarned statements to Lt. Fu does not preclude the admission of Shi's properly-warned confession to Agent Torikai.

B

Even if the taint of his pre-warning statements was sufficiently dissipated, Shi argues that his confession to Agent Torikai must be excluded because he did not adequately waive his *Miranda* rights. To admit an inculpatory statement made by a defendant during custodial interrogation, the defendant's "waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (internal quotation marks and citation omitted). A valid waiver of *Miranda* rights depends upon the "totality of the circumstances including the background, experience, and conduct of defendant." *Id.* (internal quotation marks and citation omitted). The prosecution bears the burden of proof, and there is a presumption against waiver. *Id.* at 536-37 (internal quotation marks and citation omitted).

1

"A waiver is voluntary if, under the totality of the circumstances, the confession is the product of a free and deliberate

choice rather than coercion or improper inducement." *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (citation omitted). Prior to his arrest, Shi spent four days in a storage compartment where he had been kept by the crew. Still, the district court found that upon his release from the compartment, Shi appeared coherent and alert. Indeed, the district court credited the agents' description of Shi's demeanor as "cocky" and "not timid at all." In addition, Shi was allowed access to a bathroom before the agents escorted him to the dining area to read him the warnings.

Finally, there is no evidence of police coercion. *See United States v. Kelley*, 953 F.2d 562, 565 (1992) ("Coercive police activity is 'a necessary predicate' to finding a confession involuntary.") (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). While the conditions in the storage compartment were quite troubling, Shi was in the compartment as the crew's prisoner, not the Coast Guard's or the FBI's. Once the FBI released Shi from the compartment and assumed custody, the district court found no evidence that the FBI intimidated or coerced Shi in any way, or that there was "anything . . . that would render the atmosphere combative." We require "some causal connection" between police conduct and the defendant's statement to render it involuntary. *Id.* (citation omitted). No such connection exists here.

**[14]** Accordingly, Shi's coherent and "cocky" demeanor and the absence of improper tactics by the agents satisfy us that his waiver was the product of a free and deliberate choice.

2

Nevertheless, even if a waiver is voluntary, we must also determine whether the district court's finding that such waiver was "knowing and intelligent" was clearly erroneous. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (internal quotation marks and citation omitted). The

language barrier between Shi and the agents is relevant, *see Garibay*, 143 F.3d at 538, and the district court took account of such fact in making its determination. First, it credited Language Specialist Wun's testimony that he maintained a "90 to 95%" level of understanding with Shi throughout their exchange. Second, the district court noted that the Advice of Rights form provided to Shi was written in Mandarin. Although Mandarin was not Shi's native dialect, Shi had a ninth grade education and, when asked by Language Specialist Wun, stated that he understood the form. Finally, the district court found Shi's dismissal of Agent Torikai's questions as "insignificant" to be a product of his "cockiness" rather than confusion, and that Torikai and Wun's rearticulation of the *Miranda* rights eliminated whatever confusion did exist.

Based on this record, we conclude that the district court did not clearly err in concluding that Shi's waiver was knowing and intelligent. *See Doe*, 155 F.3d at 1074 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *Rodriquez-Preciado*, 399 F.3d at 1127-28 (concluding that a district court did not commit clear error in finding that a foreign defendant made a valid waiver despite confusion between the interrogating officers and the defendant over the word "methamphetamine" because the defendant told the officers he understood his rights and the officers did not indicate that the defendant had difficulty understanding English).

## C

Even if Shi's initial waiver were valid, he contends that he invoked his right to silence before he spoke. "Once a person invokes the right to remain silent, all questioning must cease." *Anderson v. Terhune*, 516 F.3d 781, 784 (9th Cir. 2008) (en banc) (citing *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). While a defendant who invokes his right to counsel must do so unambiguously, *Davis v. United States*, 512 U.S. 452, 459 (1994), we have not yet determined whether such rule applies when a defendant invokes his right to silence.

Still, we have established that, at a minimum, such invocation must not be "so equivocal or unclear that 'a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking' his right to remain silent." *Arnold v. Runnels*, 421 F.3d 859, 866 (9th Cir. 2004) (quoting *Davis*, 512 U.S. at 459 (emphasis in original)).

Shi suggests that his dismissal of Agent Torikai's questions as "insignificant" was an invocation of his right to silence. But as the district court explained, such claim is belied by the fact that Shi consistently manifested his willingness to answer questions and that Shi signed the waiver form after making this comment.

**[15]** These facts distinguish this case from *United States v. Heldt*, 745 F.2d 1275 (9th Cir. 1984), the principal authority on which Shi relies. In *Heldt*, the defendant was read his *Miranda* rights and provided with a waiver form, but told his interrogator that he "understood his rights, but *did not wish to waive them*, and that he . . . *did not wish to answer questions*." *Id.* at 1277 (emphasis added). We concluded that Heldt's refusal to sign the form was important evidence supporting the finding that he did not waive his rights. *Id.* at 1277-78. Yet as we later explained in *United States v. Andaverde*, 64 F.3d 1305 (1995), a defendant's refusal to sign the waiver form alone does not render his waiver invalid. *Id.* at 1314 (citations omitted). Rather, "a refusal to sign a waiver form is an '*indication*' that the defendant is invoking his right to silence which casts '*initial doubt*' on the government's waiver claim." *Id.* at 1313 (quoting *Heldt*, 745 F.2d at 1277) (emphasis added). Additional evidence is necessary to confirm that initial doubt. For example, in *Heldt*, "the defendant verbally *refused* to answer questions and was '*exhorted*' to answer by police." *Id.* (quoting *Heldt*, 745 F.2d at 1277-78) (emphasis added). Here, Shi never refused to sign the form or to answer questions, merely referring to Torikai's questions as "insignificant." Once Torikai again explained the rights, Shi signed the form.

Shi also argues that he invoked his right to silence during his interrogation at the federal building when he said to Agent Torikai "I don't want to talk about the accident." But as the district court explained, once Torikai responded by reminding Shi of the waiver form the fact that Shi had the right to stop talking at any time, Shi continued to respond to questions.

We conclude that Shi's comment would not have caused a reasonable officer in the circumstances to understand anything more than that Shi "might" have been invoking his right to remain silent. *See Arnold*, 421 F.3d at 866. Accordingly, Agent Torikai was not required to terminate the interrogation.

D

Finally, we consider Shi's claim that his confession was involuntary. "A confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) (citation omitted). We consider the totality of the circumstances in engaging in this inquiry. *United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). Relevant factors include: (1) the time between the defendant's arrest and arraignment, (2) whether the defendant knew the nature of the offense with which he was charged at the time of his confession, (3) whether the defendant was aware that he was not required to make any statement, (4) whether the defendant had been advised of his right to counsel, and (5) whether counsel was present at the time of the defendant's confession. *Id.* (citing 18 U.S.C. § 3501(b)).

**[16]** The time that elapsed between Shi's arrest and his arraignment (approximately 19 hours) was reasonably limited. *See id.* (holding a 31-hour delay reasonable where the defendant did not speak English, could not be interrogated until an interpreter arrived, and was arraigned at the first available opportunity after interrogation was complete). Moreover, the

agents informed Shi of the charges against him upon his arrest. In addition, Agent Torikai informed Shi of his right to counsel and his right to remain silent. *See id.* at 1144-45 (finding foreign national's confession to be voluntary where he was interrogated and advised of his rights in his native language, even though he was not assisted by counsel). Of course, in the case of a foreign national, we consider whether extra steps were taken to ensure that the defendant understood his rights. *United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000). In this case, Shi was read his rights by an interpreter who maintained a "90 to 95 percent" level of understanding with him and Shi signed a *Miranda* waiver written in Mandarin Chinese. Shi told the agents he understood the form. Although this was Shi's first interaction with the United States criminal justice system, we agree with the district court that these facts indicate that Shi's statement was voluntary. *See id.* at 805 (holding that a defendant's inexperience with the United States criminal justice system and his lack of contact with the consulate did not render his *Miranda* waiver involuntary).

E

**[17]** Based on the foregoing, the district court properly admitted into evidence Shi's March 21 confession to Agent Torikai at the federal building.

V

We now move to Shi's argument that the district court should have suppressed the writings seized from his bunk area because the search warrant was deficient and because the scope of the FBI agents' search was overbroad.

A

The affidavit accompanying the search warrant listed § 2280 as the offense charged, but the warrant itself did not

cite § 2280 or describe the acts it prohibits. Shi argues that this rendered the warrant deficient because it failed to notify the executing agents as to what evidence would be relevant to a prosecution under this uncommon statute.

[18] We need not determine whether the warrant's failure to refer to § 2280 created a technical deficiency under the Fourth Amendment if we conclude that the executing agents relied on the warrant in good faith. *United States v. Crews*, 502 F.3d 1130, 1135-36 (9th Cir. 2007). Good faith reliance exists if the agents' affidavit establishes "at least a colorable argument for probable cause," and the agents relied on the search warrant in an objectively reasonable manner. *United States v. Luong*, 470 F.3d 898, 903 (9th Cir. 2006). The district court found that whatever the consequence of the warrant's failure to cite § 2280, the agents were entitled to the good faith exception because the affidavit they filed listed the statute and because the same agents who executed the warrant prepared the affidavit. We agree.

[19] The affidavit, which is incorporated by reference into the warrant, cites § 2280 and explains that Shi stabbed the Captain and First Mate and took control of the ship. Thus, even if § 2280 is an uncommon statute, we are satisfied that the affidavit adequately notified the executing agents of the evidence relevant to the charged crimes. Moreover, none of the factors which preclude the application of the good faith exception apply here.[10] Accordingly, we conclude that even if the warrant was technically deficient, the executing agents were entitled to the good faith exception.

---

[10]Specifically, (1) the agents did not mislead the magistrate judge with false statements or reckless disregard for the truth; (2) Shi does not allege that the magistrate judge abandoned her neutral role in reviewing the warrant application; (3) the warrant describes the place to be searched and the things to be found in adequate detail; and (4) the affidavit is not so lacking in indicia of probable cause that no reasonable officer could rely upon it in good faith. *See United States v. Leon*, 468 U.S. 897, 923-26 (1984).

We also reject Shi's argument that the warrant was deficient because it did not describe the items to be seized with sufficient particularity. The search warrant authorized the FBI agents to seize, among other things:

> items of personal property which tend to identify the person(s) in control, possession, and ownership of the property that is the subject of this warrant, including, but not limited to mail, photographs, personal telephone books, diaries, journals, bills and statements, keys, identification cards and documents, passport and related travel documents, bank books, checks, and check registers.

The warrant authorized a search only of the "[b]unk space, cupboard, drawer, and two storage spaces" which the crew had told the agents belonged to Shi.

The Fourth Amendment prohibits "general warrants" and prevents law enforcement from engaging in general exploratory searches. *United States v. Adjani*, 452 F.3d 1140, 1147-48 (9th Cir. 2006) (citations omitted). However, " '[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible.' " *Id.* (quoting *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir. 1986)). When determining whether a warrant which authorizes the seizure of a category of items is overbroad, we consider: (1) whether probable cause existed to seize all items of a category described in the warrant; (2) whether the warrant set forth objective standards by which executing officers could differentiate items subject to seizure from those which were not; and (3) whether the government could have described the items more particularly in light of the information available to it at the time the warrant issued. *United States v. Noushfar*, 78 F.3d 1442, 1447 (9th Cir. 1996) (citing *Spilotro*, 800 F.2d at 963).

[20] In this case, there was probable cause to seize items of Shi's property which could identify him as the person in con-

trol of the bunk area, including his mail. Further, the warrant only authorized the agents to seize written documents from the prescribed area that could identify Shi. Under such limitation, written materials such as books, magazines, or newspapers containing no identifying information would not be subject to seizure. Finally, the agents lacked additional information which would have allowed a more specific description of the items to be seized. *See id.* Accordingly, we conclude that the warrant adequately described the items to be seized. *Compare United States v. Holzman,* 871 F.2d 1496, 1509 (9th Cir. 1989) (upholding warrant authorizing a search for "any cash, jewelry, bonds and notes obtained through this fraud scheme"); *with United States v. Kow*, 58 F.3d 423, 425-26 (9th Cir. 1995) (holding a warrant to be insufficiently particularized where it authorized officers to seize from a video store any documents fitting under one of several dozen general categories).

B

Finally, Shi argues that the search of his bunk space was overbroad because the agents seized written materials written in Chinese without sending an agent fluent in Chinese to the scene who could assess the relevance of such documents. "The general touchstone of reasonableness which governs Fourth Amendment analysis . . . governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citation omitted). In this case, the warrant authorized the agents to search for items of personal property which could identify Shi, including mail, photographs, diaries, and passports, among other things. Although the agents expected such documents to be written in Chinese, it does not require a person fluent in Chinese to identify documents which meet this definition, even if such person is unable to interpret their contents. For example, even a person who cannot read a foreign language will likely be able to distinguish documents in a foreign language capable of identifying their owner (e.g., personal mail) from those which are not (e.g., magazines or

newspapers). As the Third Circuit has explained, "there are plainly circumstances in which it is reasonable to execute a warrant for documents in a foreign language (or for technical records) without the assistance of an officer who is capable of understanding the materials sought." *United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents*, 307 F.3d 137, 153 (3d Cir. 2002) (Alito, J.).

**[21]** We are persuaded that this is such a case; we conclude that the agents did not act unreasonably in failing to enlist the help of an agent fluent in Chinese in conducting the search.

## VI

Our final task is to consider whether the sentence imposed by the district court was reasonable. This requires us first to determine whether the district court committed a "significant procedural error." *United States v. Carty*, 2008 WL 763770, *5 (9th Cir. 2008) (en banc) ("It would be procedural error for a district court to fail to calculate—or to calculate incorrectly—the Guidelines range; to treat the Guidelines as mandatory instead of advisory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range." (citing *Gall v. United States*, 128 S. Ct. 586, 597 (2007))). If the district court's sentence is free from procedural error, we next consider the "substantive reasonableness of the sentence." *Id.* (citing *Gall*, 128 S. Ct. at 597).

**[22]** The district court correctly determined that the applicable Sentencing Guideline for Shi's case was U.S.S.G. § 2A1.1, which provides the advisory sentencing range for certain felonies resulting in death, including § 2280.[11]

---

[11]Shi contends that the application of this Guideline required the district court to find facts not proven to a jury because § 2A1.1 requires the offender to have committed a "premeditated killing," yet the indictment

Although that Guideline recommends a maximum sentence of life imprisonment, the district court departed downward and sentenced Shi to 36 years.

**[23]** Title 18 U.S.C. § 3553(a) lists the factors to be considered by a district court imposing a sentence.[12] The district court considered each factor in applying its downward departure. The court noted Shi's personal history, which was free from prior criminal activity, the unique circumstances of his crime, and the fact that no victims had claimed restitution. It also noted that Shi's acts were violent, serious, and put the lives of the crew at risk.[13] In light of the district court's careful consideration of the § 3553(a) factors, we are satisfied that the sentence it imposed was not unreasonable. *See Gall*, 128 S. Ct. at 594-98; *Rita v. United States*, 127 S. Ct. 2456, 2468-69 (2007).

## VII

For the foregoing reasons, Shi's conviction and sentence

---

never included such an allegation. This argument is without merit. While § 2A1.1 does apply to "cases of premeditated killing," it "*also* applies when death results from the commission of certain felonies," including § 2280. U.S.S.G. § 2A1.1(a)(1) app. n.1 (emphasis added).

[12]These factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established by the Sentencing Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among defendants who have similar criminal records and have been found guilty of similar conduct; and (7) the need to provide restitution to victims. 18 U.S.C. § 3553(a).

[13]In a case of a felony resulting in death, § 2A1.1 advises a downward departure only "if the defendant did not cause the death intentionally or knowingly." U.S.S.G. § 2A1.1(a)(1) app. n.2(B).

imposed are

**AFFIRMED.**